**ATLANTIC CITY ELECTRIC COMPANY
et al., Plaintiffs,
and
State of New York et al., Intervenors-
Plaintiffs,
v.
UNITED STATES of America and In-
terstate Commerce Commission,
Defendants,
and
Aberdeen and Rockfish Railroad Com-
pany et al., Intervenors-Defendants.**

**No. 69 Civ. 800.**

United States District Court
S. D. New York.

Oct. 28, 1969.

LeBoeuf, Lamb, Leiby & MacRae, New York City, for plaintiffs; James O'Malley, Jr., New York City, of counsel.

Louis J. Lefkowitz, Atty. Gen. of State of New York, Albany, Walter J. Myskowski, Washington, D. C., for intervenor plaintiff State of New York.

James M. Henderson, Washington, D. C., for intervenor plaintiffs Departments of Agriculture of Ten Northeastern States.

Robert M. Morgenthau, U. S. Atty., New York City, for defendant United States of America; John H. D. Wigger, Attorney, Department of Justice, Washington, D. C., of counsel.

Arthur J. Cerra, Associate General Counsel, Philip W. Getts, Attorney, Washington, D. C., for defendant Interstate Commerce Commission.

Jerome H. Shapiro, New York City, for intervenor defendants Aberdeen and Rockfish R. Co., et al.; Edward A. Kaier, New York City, of counsel.

Before KAUFMAN, Circuit Judge, and BONSAL and McLEAN, District Judges.

McLEAN, District Judge.

Seven public utilities operating in the northeastern section of the United States brought this action to enjoin and set aside an order of the Interstate Commerce Commission made on January 9, 1969, in a proceeding entitled "Ex Parte 259, Increased Freight Rates, 1968." The order permitted the Class I railroads of the United States to put into effect a rate increase on a great number of commodities. Among the rate increases so authorized was an increase of 5 per cent on bituminous steam coal, up to a maximum of 15¢ per ton. Plaintiffs are large users of bituminous steam coal and hence are adversely affected by the order. They claim that the order is unlawful and that the procedures employed by the Commission have deprived them of due process of law.

The State of New York and the Departments of Agriculture of ten other northeastern states have been permitted to intervene as parties plaintiff. They complain of the increase of 6 per cent authorized by the order in freight rates on grain, feed and feed ingredients moving into the northeastern states.

Many Class I railroads have also been permitted to intervene. They support the Commission's order.

The Commission has moved under Rule 12(b) (6) to dismiss the action on the ground that plaintiffs and intervenor plaintiffs have failed to state a claim upon which relief can be granted. In essence, the Commission asserts that the attack upon its order is premature. Decision of this question requires analysis of the Commission's order and consideration of the remedies available to plaintiffs and intervenor plaintiffs under the Interstate Commerce Act. 49 U.S.C. § 1 *et seq*.

The various steps in the proceeding before the Commission which resulted in the order under attack are set forth in two reports of the Commission, an interim report dated November 25, 1968 (332 I.C.C. 590), and a final report dated January 9, 1969 (332 I.C.C. 714). They may be briefly summarized as follows.

On March 7, 1968, the Class I railroads filed with the Commission a petition for permission to publish increased freight rates. The Commission granted their request. On March 11, 1968, the railroads filed their master tariff X-259 containing schedules of proposed increases, to be effective on May 27, 1968. The effective date was later postponed to June 24, 1968. The proposed increases ranged generally from 3 to 10 per cent, depending upon the commodity involved. By order entered June 19, 1968, the Commission suspended until January 24, 1969 all increases in excess of 3 per cent. This order also directed that an investigation be made of the proposed increases.

The investigation was divided into a number of parts, designated as "sub-numbers." "Sub-No. 2" was concerned with "railroad cost and revenue need." Other sub-numbers pertained to the increases requested on particular commodities. Sub-No. 3 was concerned with coal; Sub-No. 5 with grain. Hearings were held before hearing examiners.

Plaintiffs and intervenor plaintiffs appeared and protested the proposed increases.

The Commission's interim report dated November 25, 1968 was devoted to the need of the railroads for increased revenue, *i.e.*, Sub-No. 2 of the proceeding. The Commission concluded that "the proposed rate level, generally speaking, is within the zone of reasonableness." 332 I.C.C. at 608. The Commission went on to find that "the increased freight rates and charges herein authorized will not exceed a maximum just and reasonable level of rates and charges." 332 I.C.C. 609.

It further found:

"Our findings as to justness and reasonableness, which are based upon all of the evidence, before us including typical evidence as to rates and charges in and between all territories, will apply to the general bases of rates and charges, and will not preclude interested parties from bringing any maladjustments to our attention for correction. The increased freight rates and charges authorized herein are not considered as prescribed within the meaning of the decision in Arizona Grocery Co. v. Atchison, T. & S. F. Ry. Co., 284 U.S. 370 [52 S.Ct. 183, 76 L.Ed. 348], and will, in all respects, be subject to complaint and investigation as provided by the act." 332 I.C.C. 609.

By order dated November 25, 1968, the Commission vacated its suspension order of June 19, 1968 and permitted the full increases proposed by the railroads to take effect, except as to certain commodities, one of which was grain. As to these, the suspension order was continued.

At the beginning of its final report dated January 9, 1969, the Commission referred to its interim report of November 25, 1968, and stated that the proceeding had been continued thereafter "for the consideration of the lawfulness of the proposed and interim increases as they applied to specific commodities and services, and of the evidence and arguments of all parties with respect thereto." 332 I.C.C. 714.

The Commission then remarked:

"Inherent in a general rate increase proposal is the right of election by specific carriers to make use of the authority in whole, in part, or not at all. Thus, our conclusions herein do not require that any respondent increase its rates by any particular amount nor, except as specifically provided herein, do they preclude variability of application, provided increases do not exceed those allowed." 332 I.C.C. 715.

The Commission went on to say:

"We do not herein purport to determine whether the particular rates which result from the increases are maximum reasonable rates, nor does our order constitute a prescription of rates within the meaning of the decision in Arizona Grocery Co. v. Atchison, T. & S. F. Ry. Co., 284 U.S. 370 [52 S.Ct. 183, 76 L.Ed. 348]." 332 I.C.C. 715.

The report then discussed at length the contentions of the parties with respect to proposed increases for various commodities or groups of commodities. With respect to a few of them, not including coal or grain or feed moving to the northeast, the Commission denied the full increases requested by the railroads. As to the others, the railroads' request was approved. As far as material here, the Commission's ultimate conclusions and findings were: (1) there is a critical need on the part of the railroads for additional revenue to offset, in part, increased operating costs; (2) the basic freight rates may be increased generally in accordance with master tariff X-259; (3) the increased freight rates will not exceed "a maximum reasonable level"; (4) "Our findings as to justness and reasonableness * * * will apply to the general bases of rates and charges, and will not preclude interested parties from bringing any malad-

justments to our attention for correction." 332 I.C.C. 792.

The Commission's order dated January 9, 1969, based upon this report, provided, in a somewhat backhanded fashion, that the railroads were directed to cease and desist from collecting basic rates "increased to a greater extent than found just and reasonable herein * * *." 332 I.C.C. 793.

It is apparent from this recital that the proceeding before the Commission was a general revenue proceeding. The Commission was concerned primarily with the "need, in the public interest, of adequate and efficient railway transportation service" and with the railroads' "need of revenues sufficient to enable the carriers, under honest, economical, and efficient management to provide such service." 49 U.S.C. § 15a(2). The increases in rates were general, even though the percentage of increase varied from commodity to commodity. The new rates were "carrier-made," that is to say, the Commission merely authorized the railroads to put the increases into effect, it did not require or prescribe them. It is true that the Commission found these general increases, on an overall basis, to be just and reasonable. But the Commission did not purport to pass upon individual rates as contrasted with the general level. It neither prescribed nor specifically authorized a particular rate on a particular commodity, say coal or grain, from a specific point of origin to a specific destination.

█ If plaintiffs wish to complain of the reasonableness of a particular rate on the coal that is transported to them from a particular point of origin, they have the right to apply to the Commission under 49 U.S.C. §§ 13 and 15 to prescribe a different rate. The intervenor plaintiffs have the same right as to the rates on grain and feed with which they are concerned. This is what the Commission referred to in stating that its findings would not preclude interested parties from bringing any maladjust-

ments to the Commission's attention. Neither plaintiffs nor intervenor plaintiffs have instituted such a proceeding. The nub of the present controversy is whether or not they must do so before seeking review of the Commission's general revenue increase order.

The Commission argues that plaintiffs and intervenor plaintiffs are attacking the rates on coal and grain respectively, and that this court should not hear them at this time. The Commission contends that the two sets of plaintiffs must first exhaust their remedies under Section 13. If they do, it may turn out that the Commission will heed their protests and will adjust the rates which directly affect them. In that event, their complaint will be satisfied and there will be no need to consider the propriety of the general increase order. Plaintiffs and intervenor plaintiffs, on the contrary, say that in this action they are not attacking the rates on coal and grain as such. They say that they are complaining of the entire order, on the ground, to put it simply, that the Commission acted illegally in making it. They contend that this court should hear them now, without putting them to the trouble and expense of making an application to the Commission under Section 13, an application which may prove to be futile.

It is true that on the face of the complaint, plaintiffs do challenge the entire order and the Commission's conduct of the entire proceeding, not merely the part of it which relates to coal. Although the complaint does not allege that the Commission erred in finding that the railroads need increased revenues, it does assert that the Commission acted "without evidence in the record as to the justness and reasonableness of such rates." It alleges a number of respects in which the Commission acted improperly, i. e., in not making its Bureau of Accounts a party to the proceeding, in failing to order its examiners to make preliminary decisions, in failing to afford plaintiffs an opportunity to propose findings and conclusions, in failing

to require the railroads to submit evidence of cost, in making findings on the basis of unsupported opinion, et cetera.

The intervenors' complaint alleges that the Commission "erred" and "acted arbitrarily, capriciously and abused its discretion" in a variety of ways. For example, the complaint asserts that the Commission rejected evidence that traffic subjected to higher percentage increases was presently bearing a disproportionate contribution to rail revenues, that the Commission refused to consider plaintiffs' cost study, that its findings in various respects were contradicted by the evidence, that it refused to give any weight to economic conditions and trends in northeastern agriculture, et cetera.

The Commission's motion to dismiss is based upon the face of the complaints. It necessarily admits for the purposes of this motion the truth of their allegations, in so far as those allegations are statements of fact rather than legal conclusions. Thus, although the Commission does not admit that it erred or that it acted illegally, arbitrarily or capriciously, it does admit that it did not take the procedural steps which plaintiffs say it should have taken, that it rejected proferred evidence which plaintiffs deem relevant, and the like. Nevertheless, the question remains whether this court at this time should undertake to pass upon these matters and decide the merits of plaintiffs' claims.

█ It is clear that the general revenue order which the Commission made here was within its powers under 49 U. S.C. § 15a(2), in view of the impracticability of dealing with specific rates in a proceeding in which hundreds of commodities were involved. United States v. Louisiana, 290 U.S. 70, 54 S.Ct. 28, 78 L.Ed. 181 (1933); King v. United States, 344 U.S. 254, 73 S.Ct. 259, 97 L. Ed. 301 (1952).

As to the reviewability of the order, the Commission and the intervenor railroads rely primarily upon three decisions: Algoma Coal & Coke Co. v. United States, 11 F.Supp. 487 (E.D. Va. 1935); Koppers Co. v. United States, 132 F.Supp. 159 (W.D. Pa. 1955); Florida Citrus Commission v. United States, 144 F.Supp. 517 (N.D. Fla. 1956), aff'd, 352 U.S. 1021, 77 S.Ct. 589, 1 L.Ed.2d 595 (1957). See also, Birmingham Slag Co. v. United States, 11 F.Supp. 486 (N. D. Ala. 1935).

These cases support the Commission's position here. They held in substance that the court will not entertain a suit to enjoin an order of the Commission in a general revenue proceeding when plaintiffs have not exhausted the remedy afforded them by Section 13 to seek an adjustment of the particular rates which affect them. The distinctions which the present plaintiffs attempt to draw between those cases and this one do not seem to us to be substantial or significant. The fundamental principle is the same. As the court said in *Koppers*:

"It is not for this court to tinker with the delicate and fragile machinery of rate fixing and rate apportionment until the administrative process has been meticulously and stringently followed and exhausted in accordance with statutory requirement. The Commission must be afforded every available opportunity to utilize its vast reservoir of knowledge, experience, and know-how—in a proceeding wherein an unequivocal compliance with Sections 13 and 15 has been made with a complaint filed and defendant or defendants served, and clear-cut adversary contests evaluated and conclusively ruled upon, before the arm of the court should intercede upon the merits." 132 F.Supp. at 163.

It may be that in some of the cases cited plaintiffs aimed their attack more directly at the rates authorized by the general revenue order than do the present plaintiffs and intervenors. But the fact remains that in this case as in the others plaintiffs' real concern is with the increased rates which the order authorized on the commodities in which they are interested. If the Commission

had not approved a general increase on coal and grain and feed, plaintiffs and intervenors would not be here complaining of the procedures followed by the Commission.

■ And it is as true in this case as in the others that by pursuing their remedy in a Section 13 proceeding, plaintiffs and intervenors may achieve the relief that they are really seeking, *i. e.*, a reduction in the particular rates on coal and grain and feed. This court cannot assume that the Commission will deny them relief nor can it relieve them from the necessity of seeking it because to do so may be time-consuming and expensive. In our opinion, this is what the statutory scheme requires. Until this step has been taken, plaintiffs have not suffered any real injury. Only if and when their application under Section 13 is rejected will the Commission's action be ripe for judicial review.

We have carefully considered plaintiffs' argument that it is unjust to deny them a review of the Commission's general revenue order at this time because this is their only opportunity to have it reviewed. They maintain that in a subsequent Section 13 specific rate proceeding, the Commission will not consider their objections to the procedures followed in the prior general revenue proceeding and hence that they will be forever foreclosed from obtaining a judicial determination of the merits of the claims which they now assert. By way of justification of their fears, they cite Koppers Co. v. Chesapeake & Ohio Ry., 303 I.C.C. 383 (1958), a proceeding before the Commission subsequent to the court's refusal to review the Commission's general revenue order in Koppers Co. v. United States, 132 F.Supp. 159 (W.D. Pa. 1955), previously discussed. In the course of its opinion, the Commission said, with reference to the prior general revenue order:

"Admittedly, the variances in the assailed proportional rates stemmed from our general authorization in that proceeding, but whether or not the permissive order entered was justified based on the evidence of record therein is not a relevant consideration in the instant proceeding." 303 I.C.C. 387.

■ We do not attempt, of course, to pass upon the propriety of this ruling of the Commission in the *Koppers* case. It is enough to say that in the case before us, we believe that plaintiffs' fears, however natural they may be under the circumstances, are unfounded. The general revenue order authorizing the over-all increases is a necessary foundation or starting point for any subsequent determination of rates specifically applicable to plaintiffs. We see no reason why, upon making a proper record before the Commission in a Section 13 proceeding, plaintiffs cannot preserve the objections which they now assert to the procedure leading up to the general revenue order. We believe that an adverse ruling of the Commission on these objections should be reviewable by a court upon its review of the Commission's final order in the Section 13 proceeding. Although independent research by the court on this subject has revealed no decision directly in point, it is our view that an analogy may be found in cases involving the review of the Commission's order under Section 13(4) with regard to intrastate rates in which criticisms of a prior general order involving interstate rates were considered by the court. *See, e. g.,* Illinois Commerce Commission v. United States, 292 U.S. 474, 54 S.Ct. 783, 78 L. Ed. 1371 (1934); North Carolina v. United States, 325 U.S. 507, 65 S.Ct. 1260, 89 L.Ed. 1760 (1945); Tennessee v. United States, 113 F.Supp. 634 (M.D. Tenn. 1953), aff'd, 346 U.S. 891, 74 S. Ct. 222, 98 L.Ed. 394 (1953). In any event, we are satisfied, for the reasons previously mentioned, that the statute does not contemplate an attack upon the general revenue order at this stage.

The Commission's motion is granted. The action is dismissed for failure to state a claim.

So ordered.