# ABERDEEN & ROCKFISH RAILROAD CO. ET AL. *v.* STUDENTS CHALLENGING REGULATORY AGENCY PROCEDURES (SCRAP) ET AL.

No. 73–1966.   Argued March 26, 1975—Decided June 24, 1975*

---

*Together with No. 73–1971, *United States et al.* v. *Students Challenging Regulatory Agency Procedures (SCRAP) et al.*, also on appeal from the same court.

*Charles A. Horsky* argued the cause for appellants in No. 73–1966. With him on the briefs were *Michael Boudin, Edward A. Kaier,* and *Albert B. Russ, Jr. Deputy Solicitor General Randolph* argued the cause for the United States et al. in No. 73–1971. On the briefs were *Solicitor General Bork, Assistant Attorney General Johnson, Fritz R. Kahn, Betty Jo Christian,* and *Charles H. White, Jr.*

*John F. Hellegers* argued the cause and filed a brief for appellees Students Challenging Regulatory Agency Procedures et al. in both cases. *Edward L. Merrigan* argued the cause and filed briefs for appellees National Association of Recycling Industries, Inc., et al. in both cases. *E. Bruce Butler* argued the cause for appellee Institute of Scrap Iron and Steel, Inc., in both cases. With him on the brief were *Thomas H. Boggs, Jr., George Blow, Howard Gould,* and *David Reichert.*

MR. JUSTICE WHITE delivered the opinion of the Court.

The Nation's railroads, the United States, and the Interstate Commerce Commission (ICC) appeal from the judgment of a three-judge federal court which set aside an ICC order terminating a general revenue proceeding without declaring unlawful certain rate increases filed by the Nation's railroads with the ICC. The order directed the ICC to reopen the proceeding, prepare a better environmental impact statement under § 102 (2)(C) of the National Environmental Policy Act (NEPA), 83 Stat. 853, 42 U. S. C. § 4332 (2)(C), hold hearings, and reconsider, in light of the new impact statement, its determination not to declare the rate increases applicable to recyclables [1] unlawful.

The impact statement involved is that required by § 102 (2) of NEPA, 42 U. S. C. § 4332 (2), set out in the margin.[2] The judgment was based on the three-judge

---

[1] The term recyclables will refer throughout this opinion to materials obtained from products which have already been put to one commercial use—for example, iron or steel obtained from a junked automobile.

[2] "[A]ll agencies of the Federal Government shall—

"(A) utilize a systematic, interdisciplinary approach which will insure the integrated use of the natural and social sciences and the

court's view that the 150-printed-page impact statement prepared by the ICC in connection with the general revenue proceeding insufficiently considered certain environmental issues and thus failed to comply with the mandate of subsection (2)(C) of § 102 of NEPA; and that failure of the ICC to hold hearings after preparing a draft of the statement violated the command of the statute that the statement "accompany the proposal

---

environmental design arts in planning and in decisionmaking which may have an impact on man's environment;

"(B) identify and develop methods and procedures, in consultation with the Council on Environmental Quality . . . , which will insure that presently unquantified environmental amenities and values may be given appropriate consideration in decisionmaking along with economic and technical considerations;

"(C) include in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on—

"(i) the environmental impact of the proposed action,

"(ii) any adverse environmental effects which cannot be avoided should the proposal be implemented,

"(iii) alternatives to the proposed action,

"(iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and

· "(v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.

"Prior to making any detailed statement, the responsible Federal official shall consult with and obtain the comments of any Federal agency which has jurisdiction by law or special expertise with respect to any environmental impact involved. Copies of such statement and the comments and views of the appropriate Federal, State, and local agencies, which are authorized to develop and enforce environmental standards, shall be made available to the President, the Council on Environmental Quality and to the public as provided by section 552 of Title 5, and shall accompany the proposal through the existing agency review processes . . . ."

through the existing agency review processes." Because we believe that the District Court erred in several respects, we reverse.

## I

This lawsuit has a lengthy history, a brief summary of which is necessary to an understanding of the issues presented by this appeal. In December 1971, citing sharply increasing costs and decreasing or negative profits, substantially all of the Nation's railroads collectively proposed to file tariffs increasing their freight rates by 2.5% across the board. The "surcharge" was stated to be temporary and was to be followed by a filing for larger, somewhat selective rate increases. Finding that the railroads had a critical and immediate need for revenue, the ICC declined to exercise its power to suspend proposed rate increases under 24 Stat. 384, as amended, 49 U. S. C. § 15 (7), and the surcharge became effective on February 5, 1972. On March 17, 1972, the railroads filed their selective-increase proposal, which would result in an average increase across the board of 4.1% over the rates antedating the surcharge—these new selective increases to become effective on May 1, 1972. Meanwhile, the ICC had directed the railroads to file an environmental impact statement with respect to the rate increases and to serve it on interested parties. This was done on January 3, 1972, and those served included appellee SCRAP. Numerous comments were received in response to this statement. On April 24, 1972, the ICC suspended the effectiveness of the selective increases for the maximum allowable seven-month period under 49 U. S. C. § 15 (7), until November 30, 1972, pending its investigation, styled *Ex parte 281,* into their lawfulness. On March 6, 1972, the ICC served a brief draft environmental impact statement of its own on all parties to *Ex parte 281,* including appellees and the Council on Environmental Quality

(CEQ), the Environmental Protection Agency (EPA), and the Department of Transportation. The statement discussed environmental consequences of rate increases with respect to recyclables in general terms and concluded that the ICC had no basis yet to believe that the environment would be substantially affected thereby.

Thereafter, while the selective rates were suspended but the surcharge was being collected, a group of law students—(SCRAP)—and other environmental groups filed the instant lawsuit alleging that the ICC had made a decision not to suspend the 2.5% surcharge pending its investigation—which decision would have a substantial effect on the environment—without preparing an environmental impact statement or considering environmental issues, as required by the NEPA. Appellees claimed that the pre-existing rate structure discriminated against recyclables and in favor of virgin materials, and that the across-the-board rate surcharge exacerbated this situation with the unfortunate consequence to the environment that use of recyclable materials would be inhibited and use of virgin materials encouraged. The complaint sought to compel the ICC to suspend the rate surcharge and to enjoin the railroads from collecting it.

A three-judge court was therefore convened under 28 U. S. C. § 2325, which has since been repealed. Relief was granted. On direct appeal under 28 U. S. C. § 1253, this Court reversed, holding that under the doctrine of *Arrow Transportation Co.* v. *Southern R. Co.,* 372 U. S. 658 (1963), 49 U. S. C. § 15 (7) lodges in the ICC *exclusive* power to suspend rate increases pending final determination of their lawfulness. *United States* v. *SCRAP,* 412 U. S. 669 (1973) (*SCRAP I*).

Meanwhile, on October 4, 1972, the ICC issued a final report dated September 27, 1972, declining, in the main,

to declare unlawful the selective rate increases, and terminating the suspension order previously entered. The surcharge was canceled, those increases having been subsumed in the selective increases. The report, which was prepared after extensive written responses to the draft environmental impact statement had been submitted by various Government and nongovernment agencies and after oral hearings had been held, covers 92 printed pages, 17 of which deal with the question whether the railroads were in need of additional revenue; 15 of which deal with general environmental consequences which might flow from the increases; and 36 of which deal with the environmental consequences to flow from specific increases in rates on specific recyclable materials.

The report noted that the "principal issue" in a general revenue proceeding is whether the railroads are in need of additional revenue; and concluded that the railroads had demonstrated overwhelmingly that they were. It then stated that there were two possible adverse affects on the environment which might flow from failure to declare the increases unlawful. First, the increase in rail rates might divert traffic to trucks, which are allegedly heavier polluters than trains. Second, the increase in rates for recyclables might discourage their use resulting in increased solid waste—disposal of which creates environmental problems—and an accelerated depletion of the country's natural resources. The danger of diversion to truck traffic was considered insubstantial for several reasons, among which were the fact that truck rates had increased due to similar increases in costs and the fact that the rate increases sought by the railroads were permissive and would not be used with respect to commodities which would be diverted to trucks. Moreover, any danger of diversion was plainly outweighed by

the fact that the railroads needed money and would eventually go out of business without the increases.[3]

With respect to recyclables, the report emphasized that time is of the essence in general revenue proceedings in light of the claim of need by the railroads for imme-. diate revenue and that their entitlement to the overall increase usually follows from a showing of such need. The consideration of other factors is therefore necessarily abbreviated and their further analysis is postponed to specialized proceedings more appropriate for their in-depth consideration, such as proceedings incident to individual complaints filed under 49 U. S. C. § 13 (1) asserting that a particular rate or group of rates, such as rates on recyclables, are unjust and unreasonable, too high in relation to other rates, or otherwise illegal under the applicable law. Indeed, the report pointed out that the ICC had itself begun *Ex parte 270,* a separate comprehensive investigation into the entire rate structure and was there focusing on the question whether the rate pattern interfered with the Government's environmental program. The report noted that there were limits on the extent to which the applicable provisions of the Interstate Commerce Act would permit special rates for recyclables or allow the ICC to require the railroads to subsidize their transportation. Applying standard ratemaking criteria, the report rejected, on the basis of the information then before it, the claim that the underlying rate structure discriminated against recyclables. It also concluded that the use of recyclables, particularly ferrous scrap, was not responsive to rate increases—particularly when accompanied by similiar rate increases applicable to competing virgin materials. The ICC ordered a 3% ceiling on increases with respect to some, but not all,[4] recyclables,

---

[3] None of the appellees nor the court below fault the ICC's analysis of this problem. It has, therefore, dropped out of the case.

[4] The increases with respect to ferrous scrap were not held down.

and concluded that there was no reason for finally determining in the context of a general revenue proceeding whether the rate structure, with or without the scheduled increases, was unjust and unreasonable or illegally discriminatory. The report also stated that having given extensive consideration to environmental factors, *SCRAP I,* 412 U. S., at 683 n. 11, the ICC would not file a separate, formal environmental impact statement under § 102 (2)(C) of the NEPA.

The report indicated that the increases on nonrecyclables would become effective on 15 days' notice from the railroads and that the increases on recyclables would become effective on 35 days' notice. The increased period for recyclables was set so that interested parties would have the opportunity to comment on the report. The ICC issued an order to that effect on October 4, 1972.

In response to comments which were filed by several parties, the ICC reopened *Ex parte 281* on November 7, 1972, to reconsider the environmental effects of the new rates on recyclables in light of a fuller written consideration of these issues. The new rates on recyclables were suspended with the consent of the railroads for an additional seven months until June 10, 1973.

On March 13, 1973, the ICC served an expanded draft environmental impact statement. Comments were thereafter received from the EPA, the CEQ, the Department of Transportation, all of the appellees herein, and others. On May 1, 1973, the ICC issued a final impact statement covering 150 printed pages, with an additional 21-page bibliography. The main difference between the October 4, 1972, report and the impact statement was that the latter substantially expanded on the discussion of the underlying rate structure and the effect of rate increases on each of the recycling industries. With respect to the underlying rate structure, the conclusion, in the light of

the then-available information and under the controlling ratemaking principles, was that it did not discriminate. The statement examined factors affecting the price of each recyclable commodity and factors other than price affecting the demand for such commodities. It was again concluded that freight rate increases affect such demand only negligibly. The ICC re-emphasized that in general revenue proceedings analysis might fall short of what might transpire in other kinds of proceedings under 49 U. S. C. § 13 or in the Commission's own *Ex parte 270*, to which attention was again called.[5] The conclusion of the ICC was that its order of October 4 had been correct; *Ex parte 281* was therefore finally terminated without declaring any of the proposed rates unlawful except as previously provided in the October 4 order.[6]

On May 30, 1973, 11 days before the increased rates on recyclables were to become effective, appellees SCRAP and EDF filed a motion—apparently in the context of their earlier filed complaint against the surcharge—for a preliminary injunction restraining the implementation of the freight rate increases with respect to recyclables. On June 7, 1973, the three-judge court entered an order temporarily enjoining the railroads from collecting the rates, declaring, without any explanation whatever, that

---

[5] Following the form implied by the statute, the statement included separate sections for each of the questions set forth in 42 U. S. C. §§ 4332 (2) (C) (i)–(v). The statement concluded that the ICC's action would have no long-term or irreversible effects. It also concluded that, as an alternative, Congress might choose to subsidize recyclables in ways which did not place the burden of subsidies on the railroads or shippers of virgin materials.

[6] Commissioner Brown felt that the statement gave ample consideration to environmental matters but that the Commission should have decided, on the basis of the statement, to declare all increases on recyclables unlawful. Commissioner Deason also dissented.

such order would "not substantially harm the railroads." [7]
The railroads and the ICC filed appeals. On June 8,
1973, THE CHIEF JUSTICE stayed the order upon the rail-
roads' motion. On June 25, 1973, the full Court declined
to vacate the stay on motion by appellees SCRAP and
EDF, 413 U. S. 917. The increases in recyclables were
then placed into effect and continue in effect today.
On November 19, 1973, this Court vacated the prelim-
inary injunction and remanded the cases for reconsidera-
tion in light of *Atchison, T. & S. F. R. Co.* v. *Wichita Bd.
of Trade,* 412 U. S. 800 (1973). 414 U. S. 1035.[8]

Meanwhile, appellees had filed motions for summary
judgment before the three-judge court seeking (a) a
declaration that the ICC's orders declining to declare
the rate increases unlawful were themselves unlawful
because the environmental impact statement was inade-
quate, and an order directing the ICC to reconsider its
decision in light of a better impact statement; and (b) a
permanent injunction restraining collection of the rate
increases on recyclables by the railroads. Over a dissent,

---

[7] Under the Interstate Commerce Act, increased rates which are
suspended will never be collected for the period of the suspension.
Increased rates which are collected are subject to refund if later
determined to be unlawful. 49 U. S. C. §§ 15 (7), 13.

[8] In *Wichita,* the ICC had approved certain increased charges
proposed by the railroad. Finding the reasons given by the
ICC for its approval to be inadequate to explain a departure from a
longstanding rule which would have invalidated the charges, the
District Court vacated the ICC's order, remanded for further pro-
ceedings, and enjoined the collection of the increased charges pend-
ing such proceedings. Seven Justices of this Court voted to reverse
the granting of the injunctive relief, four on the basis of equitable
considerations related to the doctrine of primary jurisdiction and
three on the ground that such relief is barred by the doctrine of
*Arrow Transportation Co.* v. *Southern R. Co.,* 372 U. S. 658 (1963),
see discussion, *supra,* at 298, absent a declaration of unlawfulness by
the ICC.

the District Court vacated the order of the ICC terminating *Ex parte 281* without declaring the increases unlawful and ordered it to prepare a new impact statement, hold hearings on the statement, and reconsider its decision not to find the rates unlawful. It declined to enjoin collection of the rates in the interim.

The court first rejected the applicability of the line of lower-court cases, beginning with *Algoma Coal & Coke Co.* v. *United States*, 11 F. Supp. 487 (ED Va. 1935), holding decisions of the ICC not to declare proposed increased rates unlawful *in general revenue proceedings* to be unreviewable. The court noted that this Court had divided evenly in 400 U. S. 73 (1970) in affirming *Atlantic City Electric Co.* v. *United States*, 306 F. Supp. 338 (SDNY 1969), and *Alabama Power Co.* v. *United States*, 316 F. Supp. 337 (DC 1970), and that the rule against reviewability of general revenue proceedings was therefore of questionable vitality—especially where the issue presented for review is not the reasonableness of a particular rate but the general question whether the railroads' revenue needs justify environmental costs. However, the court rested its holding on the ground that this is a NEPA case. It said that unlike shippers, who may properly be made to exhaust their remedies under 49 U. S. C. §§ 13 and 15 by seeking refunds, environmental groups *may* not have such remedies. Moreover, environmental issues are better considered at a single general revenue proceeding than at countless individual § 13 proceedings and their resolution must be reviewed promptly in order to avoid irreparable damage to the environment. Environmental degradation occurring while a § 13 proceeding is pending is irreparable, unlike injury to shippers which can be cured by reparations.

The court then found that the ICC had failed to comply with NEPA in two respects. First, no oral hearing

had been held after circulation of the second draft impact statement on March 13, 1973, and before the preparation of the final impact statement. The court conceded that NEPA does not require the holding of hearings which the agency does not otherwise hold; and that the ICC is not required to hold hearings in a general revenue proceeding, *United States* v. *Florida East Coast R. Co.*, 410 U. S. 224 (1973). However, it ruled that since the ICC held an oral hearing before adopting its October 4, 1972, report, such a hearing was therefore presumptively an "existing agency review process" and one should have been held before adopting the final environmental impact statement on May 1, 1973. Moreover, the ICC had simply reconsidered its October 4, 1972, decision in light of the impact statement, instead of starting all over again from the beginning. In order to start over again, it had to consider its impact statement at an oral hearing. Second, the court concluded that the report did not give "good faith" consideration to environmental factors. The court viewed the tone of the impact statement as "combative, defensive and advocatory"; it criticized the ICC for refusing to find in NEPA a congressional expression that it should invalidate rates otherwise just and reasonable on the ground that the rates would negatively affect the environment; and it criticized the ICC for refusing to change its analysis even after other Government agencies commented unfavorably on the statement. It held the statement deficient in two respects. First, it held that the statement did not sufficiently analyze the underlying rate structure and that the ICC had instead considered *only* the impact of the increase involved in *Ex parte 281*. Second, the ICC should have more extensively explored the quantitative response of recycling businesses to freight rates by conducting a "rigorous price sensitivity study" and by analyzing whether industry

would develop new technology to utilize secondary materials if encouraged to do so by lower transportation costs.

The court then vacated the orders of the ICC, which had terminated *Ex parte 281* without declaring the rate increases unlawful, and ordered the ICC to prepare a new impact statement analyzing the underlying rate structure, the elasticity of demand for recyclables, and the probability of encouraging new technology in the use of scrap. It ordered the ICC to hold hearings after circulating the new impact statement and to fully consider anew in light of the new statement and the hearing whether the increased rates should be declared unlawful. The court declined to enjoin the collection of the rates, while claiming that it could have, and probably should have done so, notwithstanding *Atchison, T. & S. F. R. Co.* v. *Wichita Bd. of Trade, supra.*[9]

The railroads appeal, claiming that the District Court had no jurisdiction over this case, and that the ICC had, in any event, fully complied with NEPA. The ICC and the United States appeal, claiming only that the ICC has fully complied with NEPA. We noted probable jurisdiction in both cases. 419 U. S. 822 (1974).

## II.

At the outset we face a challenge to our appellate jurisdiction. Under 28 U. S. C. § 2325, now repealed,[10] a

---

[9] In light of the fact that the court remanded to the ICC for further proceedings as to the lawfulness of the increase, injunctive relief was precluded by *SCRAP I*, which held that the district courts are without power to suspend rates *pending* a determination of lawfulness *by the ICC.*

[10] After February 28, 1975, review of ICC orders other than orders for the payment of money or in connection with suits to *enforce* ICC orders will be by courts of appeals. Pub. L. 93–584, § 5, 88 Stat. 1917.

three-judge court was required to grant "[a]n interlocutory or permanent injunction restraining the enforcement, operation or execution, in whole or in part, of any order of the Interstate Commerce Commission." Title 28 U. S. C. § 1253 gives us jurisdiction to determine appeals from "an order granting or denying . . . an . . . injunction in any civil action . . . required . . . to be heard and determined by a district court of three judges." All parties agree that the action below was a civil action required to be heard and determined by a three-judge court, for appellees sought an injunction restraining collection of the increased rates which the ICC had refused to declare unlawful.

The question under the statutory language is whether the order being appealed from is an "injunction" within the meaning of that word as used in § 1253. Appellees claim that since the court below declined to restrain collection of the increased rates, its order was not an injunction but a declaratory judgment not appealable under § 1253, e. g., *Mitchell* v. *Donovan*, 398 U. S. 427 (1970); *Gunn* v. *University Committee*, 399 U. S. 383 (1970). But the District Court's order not only declared that the ICC had failed to comply with NEPA, it also *directed* the ICC to perform certain acts. The order was plainly cast in injunctive terms. The order "directs" the ICC to reopen *Ex parte 281* and to conduct further proceedings which "must" include preparation of an impact statement dealing with enumerated issues. In declining to restrain collection of the rates, the court said it was declining to grant "to plaintiffs *additional* injunctive relief" (emphasis added). Were the order of the District Court left undisturbed, the ICC would hardly be free to decline to prepare a new impact statement or to conduct further proceedings. The order would have as coercive an effect on the ICC, its members, and its

staff, as could any order of a district court in a proceeding to review an order of the ICC. This is enough to bring the order of the court below within the meaning of the word "injunction," as used in § 1253.[11]

It is also apparent that the District Court's injunction restrained "the enforcement, operation or execution" of the order of the ICC within the meaning of § 2325 and could therefore have been issued only by a three-judge court. The ICC order of October 4, 1972, reaffirmed on May 1, 1973, declined to declare the general rate increase unlawful, or with minor exceptions to interfere with its collection. That order terminated *Ex parte 281*. The District Court, although it did not enjoin collection of the increased rates, emasculated the ICC order in major respects. Contrary to the order of the ICC, *Ex parte 281* was to be reopened and further proceedings had with respect to the legality of the increased rates. Contrary to the ICC order, the environmental impact statement of the ICC was declared insufficient and a new statement ordered prepared. The District Court's order, as we

---

[11] Appellees argue that the order of the court below is not an injunction because it is not enforceable by contempt. They cite nothing to support this claim and we reject it. The court ordered the ICC, *inter alia*, to prepare another impact statement. Were the ICC to refuse to do so, the court would have no way of enforcing its order other than contempt, and it could not permit its order to be ignored. Moreover, we have repeatedly exercised jurisdiction under § 1253 over appeals from orders, unlike the one entered in this case, not cast in injunctive language but which by their terms simply "set aside" or declined to "set aside" orders of the ICC. *Chicago, M., St. P. & P. R. Co.* v. *United States,* 366 U. S. 745, 746 (1961); *Ayrshire Collieries Corp.* v. *United States,* 331 U. S. 132, 141 (1947); *Electronic Industries Assn.* v. *United States,* 310 F. Supp. 1286 (DC 1970), aff'd, 401 U. S. 967 (1971). Indeed, in *Electronic Industries,* we requested separate briefs on the question whether there was a jurisdictional difference in ICC cases between "injunctions" and orders "setting aside" ICC determinations and concluded that we had jurisdiction over the appeal.

have said, was in injunctive terms; and it is not tenable to assert that it did not interfere with the operative effect of the ICC order of May 1, 1973.[12]

[12] The soundness of this conclusion appears even more clearly from the legislative history of 28 U. S. C. § 2325. Before 1948, review of ICC orders was governed by the Urgent Deficiencies Appropriations Act of 1913. 38 Stat. 220. It provided in part:

"No interlocutory injunction suspending or restraining the enforcement, operation, or execution of, *or setting aside,* in whole or in part, any order made or entered by the Interstate Commerce Commission shall be issued or granted by any district court of the United States, or by any judge thereof, or by any circuit judge acting as district judge, unless the application for the same shall be presented to a circuit or district judge, and shall be *heard and determined by three judges,* of whom at least one shall be a circuit judge, and unless a majority of said three judges shall concur in granting such application . . . and upon the final hearing of any suit brought to suspend or set aside, in whole or in part, any order of said commission the same requirement as to judges and the same procedure as to expedition and appeal shall apply." (Emphasis added.)

As can be seen, the three-judge requirement applied to orders "setting aside" an order of the ICC without in terms requiring as a prerequisite that the enforcement, operation, or execution of the order be restrained. In 1948, as part of the revision and codification of Title 28 and its enactment into positive law, the Urgent Deficiencies Appropriations Act was replaced by 28 U. S. C. §§ 2321–2325. The reviser's notes, which are authoritative in the construction of the 1948 revision, *United States* v. *National City Lines,* 337 U. S. 78, 81–82 (1949); *Stainback* v. *Mo Hock Ke Lok Po,* 336 U. S. 368, 376 n. 12 (1949), state, with respect to 28 U. S. C. § 2325, simply that it derives from "title 28, U. S. C., 1940 ed., § 47 (Oct. 22, 1913, ch. 32, 38 Stat. 220)," which is the Urgent Deficiencies Appropriations Act. Under the longstanding principle of *United States* v. *Ryder,* 110 U. S. 729, 740 (1884), it "will not be inferred that the legislature, in revising and consolidating the laws, intended to change their policy, unless such intention be clearly expressed." No such intent is expressed here, and in our view 28 U. S. C. § 2325 required three judges for entering all orders for which they were required under the Urgent Deficiencies Appropriations Act, which includes orders setting aside ICC orders. In other words, an order "setting

## III

The railroads, but not the United States or the ICC, argue that the District Court had no jurisdiction to review the decision of the ICC, made in a general revenue proceeding, not to declare the increased rates unlawful. The argument is supported by a long line of District Court decisions; see, e. g., *Algoma Coal & Coke Co.* v. *United States,* 11 F. Supp. 487 (ED Va. 1935); *Koppers Co.* v. *United States,* 132 F. Supp. 159 (WD Pa. 1955); *Florida Citrus Comm'n* v. *United States,* 144 F. Supp. 517 (ND Fla. 1956), aff'd *per curiam,* 352 U. S. 1021 (1957); *Atlantic City Electric Co.* v. *United States,* 306 F. Supp. 338 (SDNY 1969), and *Alabama Power Co.* v. *United States,* 316 F. Supp. 337 (DC 1969), both aff'd by an equally divided Court, 400 U. S. 73 (1970); *Electronic Industries Assn.* v. *United States,* 310 F. Supp. 1286 (DC 1970), aff'd, 401 U. S. 967 (1971); and its correctness in its application to this case turns in part on an understanding of just what a general revenue proceeding is.

---

aside" an ICC order inevitably restrains its "enforcement, operation or execution," within the meaning of § 2325, now repealed.

At oral argument, SCRAP contended that under *United States* v. *Griffin,* 303 U. S. 226, 233 (1938), the Urgent Deficiencies Appropriations Act did not permit review "to set aside every kind of order issued by the Commission" and in particular did not permit review of an order such as the one set aside in this case which simply involved a refusal by the Commission to change the existing status. *Id.,* at 234. Insofar as it rested on the negative-order doctrine of *Procter & Gamble Co.* v. *United States,* 225 U. S. 282 (1912), *Griffin* is no longer the law. *United States* v. *Jones,* 336 U. S. 641, 647 (1949); *Rochester Tel. Corp.* v. *United States,* 307 U. S. 125, 145 (1939). Insofar as *Griffin* was based on the notion that the Urgent Deficiencies Appropriations Act does not apply to challenges to ICC orders entered under the Railway Mail Pay Act, which are in essence suits for money, see *United States* v. *ICC,* 337 U. S. 426, 442 (1949), against the United States, it has no application to this case.

## A

Under the Interstate Commerce Act, the initiative in setting rates remains with the railroads. See *SCRAP I,* 412 U. S., at 672. The ICC has the power, after exercise of this initiative by the railroads, and after an investigation, either upon its own initiative or upon complaint by an interested party, to declare a rate unlawful if it finds that the rate is unjust, unreasonable, preferential, discriminatory, or otherwise in violation of the Act. 49 U. S. C. §§ 13 and 15. The ICC, and only the ICC, *SCRAP I, supra,* also has the power to suspend a new rate for up to seven months pending its determination of lawfulness. 49 U. S. C. § 15 (7).[13] Where the increase initiated by a railroad relates only to a single commodity, and where the ICC conducts an investigation, the investigation will be a thorough inquiry into the justness and reasonableness of that particular rate. However, the reason for increasing a particular rate may be a reason, such as across-the-board cost increases, which dictates an increase in virtually all rates by a large number of railroads. In those cases, the railroads have, in the exercise of their initiative, proposed across-the-board increases applicable to all or nearly all of their rates. This Court in *New England Divisions Case,* 261 U. S. 184, 196–198 (1923), recognizing the practical problems which the ICC faced in such a situation, permitted it to find the new rates lawful after taking proof relating not to any particular rate but to the reasonableness of the in-

---

[13] Failure to suspend does not always do irreparable harm to shippers who pay the increased rates. Unless the ICC has previously exercised its ancillary power to *set* rates, or prescribe their maxima or minima, *Arizona Grocery Co.* v. *Atchison, T. & S. F. R. Co.,* 284 U. S. 370 (1932), a shipper may always obtain a refund if he establishes that rates collected after refusal to suspend were unlawful. 49 U. S. C. § 13 (1).

creases in general. In *United States* v. *Louisiana,* 290 U. S. 70, 76–78 (1933), this Court approved of an ICC procedure whereby it permitted an across-the-board rate increase to become effective after investigation—by declining to declare it unlawful, and increasing previously set maxima where necessary—*without* a finding that each new rate was lawful and without itself prescribing any of the new rates.[14] This Court, after pointing out the practical impossibility of inquiring into the reasonableness of each rate, stated:

> "[I]n performing the duty broadly to increase carrier revenue, it is enough if the Commission, *in the first instance,* makes such inquiry and investigation as would enable it to say that the prescribed increases when applied to members of the group will *generally* not exceed a reasonable maximum." *Id.,* at 76–77. (Emphasis added.)

The Court went on to say:

> "The extent of this inquiry and the detail of investigation can not be marked by this Court with certainty. The size of the group dealt with, the nature of the traffic, the urgency of the relief demanded, these and other factors should condition the Commission's procedure in each case. But with proper procedure, the ultimate finding that the rates as generally applied are reasonable, supported by evidence and accompanied by suitable reservation of the rights of all interested parties to secure modification of any particular rate which, when challenged, is found to be unjust or unreasonable, complies with the statute. The requirement that increase of rates

---

[14] To prescribe the new rates would be to cut off refund claims by injured shippers. *Arizona Grocery Co.* v. *Atchison, T. & S. F. R. Co., supra.*

by Commission action is to be in the exercise of its power to prescribe reasonable rates is thus observed but in conformity to the administrative necessities which the proviso contemplates." *Id.*, at 77.

Proceedings, such as that described in *United States* v. *Louisiana,* in which the ICC has been called upon to decide whether to prevent a substantially across-the-board rate increase, have become known as general revenue proceedings. The ICC's inquiry has tended to focus on whether the railroads are really in need of increased revenues and has tended to leave for individual rate or refund proceedings under 49 U. S. C. §§ 13 and 15 the problem of determining just which commodities on which runs should bear the increased burden, and to what extent. The ICC is careful to leave such refund claims open by including in the general revenue order a statement such as the one included here:

> "Thus, we do not attempt to determine whether the particular rates which result from the increases are maximum reasonable rates, nor does the order constitute a prescription of rates within the meaning of the decision in *Arizona Grocery Co.* v. *Atchison, T. & S. F. Ry. Co.,* 284 U. S. 370. If individual rates or groups of rates are believed to be unjust and unreasonable, a shipper or other interested persons has [*sic*] an administrative remedy available in sections 13 and 15 of the Interstate Commerce Act, 49 U. S. C. §§ 13 and 15." *Ex parte No. 281, Increased Freight Rates and Charges, 1972 (Environmental Matters)*, 346 I. C. C. 88, 103 (1973).

Of course, the ICC has the power in a general revenue proceeding to declare the new rates unlawful and disapprove the increase. It could also, if it chose, declare some of the rates discriminatory, unreasonable, or otherwise unlawful; and it could itself affirmatively approve

all or some of the rates as just and reasonable. But under the *Louisiana* case, the general rule has been that the ICC may confine its attention in general revenue proceedings almost entirely to the need for revenue and to any other factors that relate to the legality of the general increase as a whole; and it follows *a fortiori* that if attention is given to other issues, that attention may be of a limited nature.

The instant proceeding, in which substantially all of this country's railroads sought increases in substantially all of their rates based upon alleged cost increases which placed them in a financial crisis, plainly qualifies as a general revenue proceeding. Environmental issues aside, the ICC, true to form, devoted most of its investigation to the issue of the railroads' revenue needs, but did inquire to some extent into the reasonableness of the increases as applied to certain broad categories of charges.

In *Algoma Coal & Coke Co.* v. *United States,* 11 F. Supp. 487 (ED Va. 1935), shippers of coal sought review in a three-judge court of the decision of the ICC in a general revenue proceeding not to declare the proposed increases unlawful insofar as they applied to coal. The claim was that the increased rates on coal were unjust and unreasonable. The court declined to set aside the rate increases. It pointed out that the ICC's order was permissive only—it simply declined to prevent the rate increases.[15] It then stated that the ICC had not yet decided whether the increased rates on *coal specifically* were just and reasonable but had decided only that the railroad's revenue needs rendered the *general* increase reasonable; and that the plaintiffs had a procedure available to them—a complaint under § 13 seeking a

---

[15] Insofar as the court's decision rested on the fact that the ICC's decision was a negative one, it is inconsistent with *Rochester Tel. Corp.* v. *United States,* 307 U. S. 125 (1939).

refund and a declaration of unjustness or unreasonableness from the ICC—in which it could cause the ICC to decide whether the new coal rates were just and reasonable. As the ICC had not yet addressed the question presented by the plaintiffs to the court, the court declined to decide it.[16] The court also held that the decision of the ICC was in essence one not to *suspend* the rate increases and that the courts had no power to suspend if the ICC did not do so. *Board of Railroad Comm'rs* v. *Great Northern R. Co.*, 281 U. S. 412 (1930). See also *SCRAP I, supra.*

Since the *Algoma* decision, shippers seeking to undo, with respect to particular commodities, a decision by the ICC in a general revenue proceeding not to declare rate increases unlawful, have been uniformly unsuccessful. In those cases in which the shipper claimed only that the increase on a particular commodity was unjust or unreasonable—without addressing the question whether a general increase of some sort was justified—the courts have declined to rule on the issue posed for the reason that the ICC had not yet addressed it. *Koppers Co.* v. *United States*, 132 F. Supp. 159 (WD Pa. 1955); *Florida Citrus Comm'n* v. *United States*, 144 F. Supp. 517 (ND Fla. 1956); *Electronic Industries Assn.* v. *United States*, 310 F. Supp. 1286 (DC 1970). In those cases in which shippers have attacked the ICC's decision that rate in-

---

[16] The court declined to term its holding, in this regard, jurisdictional. It also said that it would review a claim that the ICC's order in a general revenue proceeding deprived a plaintiff of an "independent legal right." 11 F. Supp., at 496. Moreover, the court did address on the merits the issue which the ICC *did* decide—namely whether the evidence supported the need for a *general* rate increase. The ICC claims that courts do have jurisdiction to review its decision in this respect notwithstanding the plaintiff's failure previously to seek relief under § 13. We do not decide whether the ICC is correct. See n. 18, *infra.*

creases *in general* were justified, the courts, going beyond the *Algoma* decision, have declined review on the ground that the shipper had not exhausted his administrative remedies under §§ 13 and 15. *Atlantic City Electric Co.* v. *United States,* 306 F. Supp. 338 (SDNY 1969), and *Alabama Power Co.* v. *United States,* 316 F. Supp. 337 (DC 1969), both aff'd by an equally divided Court, 400 U. S. 73 (1970).

## B

The railroads claim that the decision of the court below violates the rule of the cases discussed above that decisions by the ICC in general revenue proceedings are unreviewable. First, the railroads argue that the decision in a general revenue proceeding not to *declare rates unlawful* is just as much an interim decision—since it does not finally decide the lawfulness of any particular rate—as is a decision not to *suspend* a particular rate pending investigation. See *Algoma Coal & Coke Co.* v. *United States, supra.* Therefore, review of that decision is squarely banned by the Court's holding in *SCRAP I* that the courts have no power to suspend, or to overturn the ICC's decision not to suspend, rates pending the ICC's final determination of their lawfulness. Second, treating the decision of the court below as though it were a substantive review of the ICC's order—addressed to the question whether the record supported the ICC's decision not to suspend the rates as to recyclables—the railroads contend that the court below reviewed an issue not yet decided finally by the ICC in violation of settled principles of finality and exhaustion of administrative remedies.[17] More generally,

---

[17] The railroads contend that environmental groups may file complaints under § 13 challenging the justness and reasonableness of rates or groups of rates. The court below tentatively ruled otherwise. In light of our disposition of the issue dealt with in this part, we need not decide which is correct.

the railroads attack the conclusion of the District Court that the rule against review of general revenue proceedings does not apply in "NEPA cases" as being squarely contrary to this Court's decision in *SCRAP I* that NEPA does not effect a change in pre-existing jurisdictional rules. We disagree with each of these arguments.

The railroads' first argument fails because the court below did not enjoin collection of the rates. The rule of *Arrow Transportation Co.* v. *Southern R. Co.*, 372 U. S. 658 (1963), and *SCRAP I* is one barring courts from entering disruptive injunctions against collection of rates not finally declared lawful or unlawful by the ICC. No such injunction is involved here. Thus even if a decision not to declare rates unlawful in a general revenue proceeding is no more final for purposes of the rule of *SCRAP I* than a decision not to suspend an individual rate pending investigation, the rule of *SCRAP I* is not applicable here.

The railroads' second argument fails because, unlike the issue of the reasonableness of a particular rate, and arguably unlike the issue of the reasonableness of a general increase,[18] the issue addressed by the court below had

---

[18] The position of the ICC seems to be that its decision that a *general* rate increase is justified by reason of revenue need is a final decision ripe for immediate review and *Algoma Coal & Coke Co.* v. *United States, supra,* would seem to support it. The railroads claim that such a decision is unreviewable absent exhaustion of § 13 remedies and they are supported in this contention by the lower court decisions in *Atlantic City Electric Co.* v. *United States,* 306 F. Supp. 338 (SDNY 1969), and *Alabama Power Co.* v. *United States,* 316 F. Supp. 337 (DC 1969), both aff'd by an equally divided Court, 400 U. S. 73 (1970). We need not resolve this issue.

Part of NEPA provides that "the policies, regulations, and public laws of the United States shall be interpreted and administered in accordance with the policies set forth in this chapter," 42 U. S. C. § 4332 (1); and one of the policies of the chapter is to "approach the maximum attainable recycling of depletable resources." The District Court expressly declined to review the question whether the ICC

already been finally decided by the ICC and the relief sought from and granted by the court below could not have been obtained from the ICC in a subsequent § 13 proceeding. The issue decided by the District Court was whether under NEPA the ICC had given adequate consideration to environmental factors in the general revenue proceeding. When the ICC terminated the general revenue proceeding, the one thing which it must certainly have finally decided was that it need give no further *consideration* to environmental factors *in that proceeding;* and no relief of the type sought from the District Court—*i. e.,* further consideration of environmental matters by the agency in that proceeding—could thereafter be obtained from the agency. Whatever issues would remain open at a § 13 proceeding, one which would not remain open—no matter who filed the complaint—is whether or not sufficient consideration had been given to environmental factors at the general revenue proceeding. Of course, the ICC would give attention in the § 13 proceeding to whatever environmental factors it felt NEPA required at *that* proceeding.

Although the railroads claim that a general revenue proceeding is an interim proceeding—the final one being a § 13 proceeding at which particular rates are adjudicated just and reasonable—for ratemaking purposes, they do not claim that it has a similar status for NEPA purposes. All parties now agree that a general revenue proceeding is itself a "major federal action," independent of any later adjudication of the reasonableness of particular rates, requiring its own final environmental

ultimately "gave insufficient weight to this environmental value" in reaching its conclusion that the general increase was justified. Therefore, this appeal does not involve reviewability of those substantive issues, including environmental issues, decided by the ICC at the general revenue proceeding.

impact statement so long as the proceeding has a sub-
stantial effect on the environment. This conclusion is
clearly correct. Thus, whatever consideration of environ-
mental matters is necessary or proper at the general reve-
nue proceeding is over and done with when that pro-
ceeding terminates. The interim nature of a general
revenue proceeding may be relevant to the question of
the extent of the consideration of environmental factors
required, but its nature does not prevent review of the
question, finally decided by the ICC, whether the environ-
mental impact statement prepared for that proceeding
is adequate.

Our holding here is in no way inconsistent with our
conclusion in *SCRAP I* that NEPA does not repeal
by implication any other statute. We do not hold that
NEPA supplies the courts with otherwise nonexistent
power to prevent collection of rates; and we do not hold
that NEPA permits review of the question of the just-
ness or reasonableness of rate increases, either general or
specific, at any earlier time than would otherwise have
been permissible. NEPA does create a discrete pro-
cedural obligation on Government agencies to give written
consideration of environmental issues in connection with
certain major federal actions and a right of action in
adversely affected parties to enforce that obligation.
When agency or departmental consideration of environ-
mental factors in connection with that "federal action"
is complete, notions of finality and exhaustion do not
stand in the way of judicial review of the adequacy of
such consideration, even though other aspects of the rate
increase are not ripe for review.

IV

We agree with appellants that the District Court erred
in deciding that the oral hearing which the ICC chose to

hold prior to its October 4, 1972, order was an "existing agency review process" during which a final draft environmental impact statement (*i. e.,* the one circulated in March 1973) should have been available and that it also erred in deciding that the ICC should have "started over again" after it decided to prepare a formal impact statement.

NEPA provides that "such statement . . . shall accompany *the proposal* through the existing agency review processes" (emphasis added). This sentence does not, contrary to the District Court opinion, affect the time when the "statement" must be prepared. It simply says what must be done with the "statement" once it is prepared—it must accompany the "proposal." The "statement" referred to is the one required to be included "in every recommendation or report on proposals for . . . major Federal actions significantly affecting the quality of the human environment" and is apparently the final impact statement, for no other kind of statement is mentioned in the statute. Under *this* sentence of the statute, the time at which the agency must prepare the final "statement" is the time at which it makes a recommendation or report on a *proposal* for federal action. Where an agency initiates federal action by publishing a proposal and then holding hearings on the proposal, the statute would appear to require an impact statement to be included in the proposal and to be considered at the hearing. Here, however, until the October 4, 1972, report, the ICC had made no proposal, recommendation, or report. The only proposal was the proposed new rates filed by the railroads.[19] Thus, the earliest time at which the *statute* required a statement was the time

---

[19] The ICC did require the railroads to circulate a draft impact statement shortly after its proposal was made.

of the ICC's report of October 4, 1972—some time after the oral hearing.[20]

The statute also requires that agencies consult with other environmentally expert agencies "prior to making any detailed statement"; and CEQ guidelines provide:

> "To the fullest extent possible, all . . . hearings [on proposed agency action] shall include consideration of the environmental aspects of the proposed action. . . . Agencies should make *any* draft environmental [impact] statements to be issued available to the public at least fifteen (15) days prior to the time of such hearings." 40 CFR § 1500.7 (d). (Emphasis added.)

Such consultation occurred here from the outset; environmental issues pervaded the hearings held—both oral and written; and all draft impact statements in existence were circulated before the hearings. *Procedurally,* NEPA was thus thoroughly complied with through October 4, 1972.

Assuming that the ICC erred in failing to prepare a separate formal environmental impact statement to accompany its October 4, 1972, report or that the consideration given to environmental factors in that report was inadequate, the ICC need *not* have "started over again." To the extent that the District Court's conclusion to the contrary is based on its belief that the draft statement of March 1973 had to be considered at a

---

[20] To the extent to which *Calvert Cliffs' Coordinating Committee* v. *AEC,* 146 U. S. App. D. C. 33, 449 F. 2d 1109 (1971); *Greene County Planning Bd.* v. *FPC,* 445 F. 2d 412 (CA2), cert. denied, 409 U. S. 849 (1972); and *Harlem Valley Transportation Assn.* v. *Stafford,* 500 F. 2d 328 (CA2 1974), read the requirement that the statement accompany the proposal through the existing agency review processes differently, they would appear to conflict with the statute.

hearing, it is incorrect for the reasons stated above. To the extent that it is based on the District Court's belief that the ICC did not in good faith reconsider its October 4, 1972, order in light of the impact statement, the District Court's decision is without support in the record. The ICC was in as good a position to correct a statutory error by integrating environmental factors into its re-opened *Ex parte 281* and into its decision in May 1973, as it would have been if the October 4, 1972, report had never been written; this it proceeded to do and we perceive no basis for affirming the District Court's decision in this respect.

V

Emphasizing again the nonfinal and limited nature of the decision made by the ICC at a general revenue proceeding, the railroads and the ICC argue that the District Court erred in concluding that the environmental impact statement itself was deficient. They claim that throughout the general revenue proceeding the Commission gave environmental issues the "hard look" which is required by NEPA, *Natural Resources Defense Council, Inc.* v. *Morton,* 148 U. S. App. D. C. 5, 16, 458 F. 2d 827, 838 (1972), and that appellees and the court below simply disagreed with their decision not to prevent the increase on recyclables. They also emphasize the fact that they were giving continuing and more extensive attention to environmental consequences flowing from the rate structure in another proceeding, *Ex parte 270,* which was more appropriate to the task. We substantially agree with this position.

In order to decide what kind of an environmental impact statement need be prepared, it is necessary first to describe accurately the "federal action" being taken. The action taken here was a decision—entirely nonfinal with respect to particular rates—not to declare unlaw-

ful [21] a *percentage increase* which on its face applied equally to virgin and some recyclable materials and which on its face limited the increase permitted on other recyclables. As in most general revenue proceedings, the "action" was taken in response to the railroads' claim of a financial crisis; and the inquiry, true to our decision in *United States* v. *Louisiana, supra,* was primarily into the question whether such a crisis—usually thought to entitle the railroads to the general increase—existed, leaving *primarily* to more appropriate future proceedings the task of answering challenges to rates on individual commodities or categories thereof.[22] The point is that

---

[21] The decision which the ICC makes in a general revenue proceeding is by law far more confined than, for example, that of an agency deciding whether and where to build a new prison. *E. g., Hanly* v. *Mitchell,* 460 F. 2d 640 (CA2), cert. denied *sub nom. Hanly* v. *Kleindienst,* 409 U. S. 990 (1972). The ICC is permitted to act against proposed rate increases, for more than a seven-month period, only if upon the basis of its investigation it can find that the rates are unlawful, *i. e.,* unjust or unreasonable, or otherwise in violation of the Interstate Commerce Act. The ICC has concluded, and we agree, that the standards of the Act are broad enough to permit consideration of environmental factors, even at general revenue proceedings, *Dayton-Goose Creek R. Co.* v. *United States,* 263 U. S. 456, 480 (1924); *Ex parte 265* and *Ex parte 267, Increased Freight Rates, 1970 and 1971,* 339 I. C. C. 125 and 209 (1971). At the same time, standard ratemaking criteria limit the power of the ICC to force railroads to transport recyclable materials at deficit rates no matter how much the environment would be benefited thereby and no matter how much environmental injury would be caused by not doing so. Under present statutes, for example, the railroads could not be required to reduce rates on recyclables to zero.

[22] Appellants have not argued that consideration of the lawfulness of particular rates on particular recyclables was in no way before the ICC in *Ex parte 281.* We assume for the purposes of this case, therefore, that the "action" taken in *Ex parte 281* included a decision not to declare rates on particular recyclables unlawful on the basis of the very limited inquiry appropriate to a general revenue proceeding.

it is the latter question—usually involved in a general revenue proceeding only to a limited extent—which may raise the most serious environmental issues. The former question—the entitlement of the railroads to some kind of a general rate increase—raises few environmental issues and none which is claimed in this case to have been inadequately addressed in the impact statement.

The appellees insist that the decision not to prevent the facially neutral increases itself involves an impact on the environment when superimposed on an underlying rate structure which discriminates against recyclables.[23] They claim that the underlying rate structure involved here does discriminate against recyclables with serious environmental consequences and that upon more extensive consideration of the issue, the ICC has in some part at least agreed with them and acted accordingly in subsequent general revenue proceedings.[24] Accordingly, it is said, the environmental consequences flowing from a facially neutral increase must be explored in an impact statement and can only be explored by analyzing the underlying rate structure. They further argue with force and some support in the record that the ICC has been tardy in complying with NEPA, that the ICC was re-

---

[23] A percentage increase increases a high rate a larger absolute amount than it does a low rate.

[24] The Commission has concluded a thorough investigation, in *Ex parte 270*, of the underlying rate structure as it applies to ferrous scrap and the virgin ores with which it competes. In *Ex parte 295*, a subsequent general revenue proceeding, the Commission concluded on further investigation that the rates on waste paper and nonferrous metal scrap are high in comparison to the virgin materials with which they compete, and it refused to permit increases as to them. It also concluded that the environmental consequences of this situation are small. In *Ex parte 310*, the most recent general revenue proceeding, the ICC declined to permit increases on either ferrous or nonferrous scrap, citing general economic factors which had hurt those industries in particular.

quired to analyze the underlying rate structure only once with a view toward environmental consequences; [25] that it had plenty of time and cause to do so before *Ex parte 281;* and that it should, therefore, not have been permitted to terminate *Ex parte 281* without having done so. This argument, however, stumbles over the holding in *United States* v. *Louisiana, supra,* which gives the ICC wide discretion in deciding what issues to address in a general revenue proceeding and permits it to postpone comprehensive consideration of claims of discrimination. It loses virtually all of its force in light of the fact that the ICC had begun an investigation of the underlying rate structure in *Ex parte 270* before commencing *Ex parte 281* and had started devoting specific attention to environmental issues in that proceeding before the decision of the court below. Thus even if NEPA—in the face of *United States* v. *Louisiana* and the failure of the appellees to initiate a proceeding under § 13 challenging rates on recyclables—were read to require the ICC to address comprehensively the underlying rate structure at least once before approval of a facially neutral general rate increase, no purpose could have been served by ordering it to thoroughly explore the question in the confined and inappropriate context of a railroad proposal for a general rate increase when it was already doing so in a more appropriate proceeding. The rate increases will remain effective in any event until such time as the ICC obtains sufficient information to declare the increase on some commodities lawful or unlawful.[26]

---

[25] See CEQ Guidelines, 40 CFR § 1500.6 (d)(1).

[26] The CEQ, on whose opposition to the impact statement appellees heavily rely, apparently recognizing the wisdom of exploring the underlying rate structure in a proceeding commenced expressly for that purpose, acquiesced in consideration of these issues in the context of *Ex parte 270,* provided only that the ICC suspend the

The decision of the lower court, therefore, to deem the "federal action" involved in *Ex parte 281* to include an implicit approval of the underlying rate structure was inaccurate and led it to an entirely unwarranted intrusion into an apparently sensible decision by the ICC to take much more limited "action" in that proceeding and to undertake the larger action in a *separate* proceeding better suited to the task.[27]

Having defined the scope of the "federal action" being taken in *Ex parte 281*, our decision of this case becomes easy. The lower court held that the environmental impact statement inadequately explored the underlying rate structure and the *extent* to which the use of recyclables will be affected by the rate structure. Whatever the result would have been if the ICC had been approving the entire rate structure in *Ex parte 281*,[28] given the nature of the action taken by the ICC, the lower court was plainly incorrect.

---

increases on recyclables in the interim. The CEQ overlooked, however, the fact that the ICC was wholly without power to do this.

[27] Apparently recognizing that the ICC's terminating of *Ex parte 281* did not terminate its consideration of environmental issues relating to its rate structure and the consequent pointlessness of forcing the ICC to duplicate its efforts in the context of *Ex parte 281*, all of the appellees, except NARI, have filed suggestions of mootness. The case is not moot. The situation is not substantially different than it was at the time of the lower court's decision; and the ICC is under an order to prepare a new impact statement in *Ex parte 281* and to hold hearings in *Ex parte 281* and to write a final report in *Ex parte 281* after the hearings. The ICC has not yet done so and claims that it should not be required to do so. NARI claims that it should be required to do so. We must decide who is right. However, we agree with the thrust of the suggestions of mootness that the relief granted below was not in the best interests of anyone.

[28] A large portion of each of the briefs in these cases is devoted to the question of the proper scope of review by a court of the adequacy of the treatment of environmental issues in an impact statement. Compare, *e. g., Lathan* v. *Brinegar*, 506 F. 2d 677 (CA9 1974), with

A review of the record discloses that environmental issues pervaded the proceeding. In terms of time, paper, and effort on the part of the Commission, the railroads, other Government agencies, and the appellees, the environmental issues far outweighed the financial issue usually thought controlling at a general revenue proceeding. The various statements, formal and informal, expressly recognized what all agree are the important possible environmental consequences involved—increased solid waste disposal and accelerated depletion of natural resources. The statements implicitly recognized the common-sense proposition that decisions to increase rates on recyclables could deter their use. The reports explored at some length the degree to which rate changes would affect the use of several separate categories of recyclables, looking, *inter alia*, at past responses to rate changes and at various other factors affecting use of recyclables including technological aspects of the different recycling industries. Finally, the statements inquired, preliminarily, into the fairness of the underlying rate structure, concluding that on the basis of the information then available no discrimination could be found. Assuming that some rudimentary examination into the underlying rate structure and into the reasonableness of the new rates on particular recyclables was required, the consideration of environmental factors in connection therewith was more than adequate. Appellees' best argument is that the ICC has acquired more knowledge since *Ex parte 281,* and has changed its mind on a number of matters and acted accordingly. This, however,

---

*City of New York* v. *United States,* 344 F. Supp. 929 (EDNY 1972). However, we need not resolve this question since, in light of the "action" taken, under any standard of review the ICC gave an adequately "hard look" at environmental matters.

simply points up the limited nature of the decision made in *Ex parte 281* and the absence of a need to reopen it.

*Reversed.*

MR. JUSTICE POWELL took no part in the consideration or decision of these cases.

MR. JUSTICE DOUGLAS, dissenting in part.

I agree with Parts I, II, and III of the Court's opinion that the cases are properly here and that the District Court had jurisdiction over appellees' complaint. On the merits, I would, however, affirm.

This litigation presents a history of foot dragging by the ICC, as other parties to proceedings before it, including other federal agencies, have attempted to prod it into compliance with the National Environmental Policy Act (NEPA). The "final impact statement" that the Court holds adequate presents a mélange of statistics that purport to show that an increase on the transportation rates of recyclable materials will not have a significant adverse impact on the environment. The Commission's "analysis" has been thoroughly discredited by the comments of other federal agencies, including not only the Environmental Protection Agency and the Council on Environmental Quality, whose principal concerns are environmental, but also the Department of Commerce and the General Services Administration. The Commission has responded to the adverse comments by papering over the defects they identify, rather than dealing with the substance of the deficiencies.

The environmental effects at stake are described in my opinion when the case was here before. *United States v. SCRAP,* 412 U. S. 669, 699–714 (1973). Appellees oppose increases on the rates for recyclables because increases in transportation costs will retard the use of recy-

cled products and thereby contribute to further depletion of our natural resources. The Commission responded initially by asserting that an increase in transportation charges would have *no* effect upon the demand for scrap materials, and cited in support of this proposition statistics showing that during a multiyear period when freight rates were rising, prices of recyclables fluctuated widely and consumption generally increased. See *Increased Freight Rates and Charges, 1972,* 341 I. C. C. 288, 397–402 (1972). The fallacy of the Commission's argument was exposed by the Council on Environmental Quality, commenting on the price of and demand for ferrous metal scrap:

> "[S]crap prices are determined by a number of factors operating simultaneously, among them are the aggregate demand for steel, the price and transportation costs of iron ore, the supply of scrap, as well as the transportation cost of scrap and other factors. It would be surprising indeed, if, in light of the number of factors constantly at work in the scrap market, a close and simple relationship existed between scrap price movements and freight rate changes.
>
> "Nor does data which shows a constantly growing consumption of scrap despite rate increases prove that freight rate decisions are inconsequential. Growth might have been materially higher or lower had . . . rate decisions been different. What is needed in each instance is a multivariate analysis to isolate the effect of transportation costs on scrap prices and the quantity consumed." [1]

Yet the Commission persisted in these assertions, and it failed to make the price sensitivity studies the Council

---

[1] Attachment to letter from Russell E. Train, Chairman of Council on Environmental Quality, to ICC, Oct. 30, 1972. App. 572.

recommended. See *Ex parte No. 281, Increased Freight Rates and Charges, 1972,* 346 I. C. C. 88, 145–149 (1973).

Appellees also argued to the Commission that the rate increases for recyclables exacerbated an existing discrimination against these materials in the rate structure. The Commission expressed doubt that any unjustified discrimination existed, arguing that any disparity was probably attributable to differing costs. But a Department of Transportation Study cited in the presentation made by the Environmental Protection Agency had concluded that ratios of revenue to cost were higher for certain recyclable commodities than for their virgin substitutes, causing the former to bear more than their "share" of the cost of service. The Commission's own statistics supported this conclusion to some extent. Comparing the revenue-cost ratios for ferrous scrap and for iron ore, the Commission found that the scrap bore the lesser share of variable costs, but a greater share of all costs—fixed and variable—than did ore. *Id.,* at 124. The Commission did not inquire further into this disparity.

The Court implicitly concedes the shortcomings of the Commission's analysis, relying, as the Commission did, on the prospect that the environmental issues would receive further study in *Ex parte 270,* a proceeding initiated to investigate the entire freight rate structure. But NEPA commands an agency to consider environmental effects before it takes a "major federal action," not to relegate consideration to further proceedings after action is taken, particularly where there is no assurance that a prompt conclusion will be forthcoming. When the Commission terminated its proceedings in *Ex parte 281, Ex parte 270* had been in progress for more than two years. The scope of the investigation had not been fully defined at that time, and the prospect of any

prompt illumination of the environmental issues was certainly remote. The Commission took no particular steps to expedite completion of that phase of the investigation that would embrace the environmental issues controverted in *Ex parte 281*. Instead, the Commission was content to put aside these issues, offering a vague assurance that they would be taken up again in the course of what promised to be a protracted proceeding. Today, nearly two years later, we are not apprised of any conclusions as to environmental issues reached as a result of *Ex parte 270;* we do not even know whether a completion date is in sight. Meanwhile, environmental damage—*irreversible* damage—which appellees alleged with considerable supporting evidence may be continuing, with its magnitude unknown.

NEPA is more than a technical statute of administrative procedure. It is a commitment to the preservation of our natural environment. The statute's language conveys the urgency of that task. The District Court acted responsibly when it refused to accept the Commission's representations that a complete treatment of the environmental issues was beyond its capability and therefore should not be required. One purpose of NEPA was to force agencies to *acquire* expertise in environmental matters, even if attention to parochial matters in the past had not demanded this capability.[2] The Court today excuses the Commission's performance. The District Court, following the spirit of NEPA, told the Commission to do better. I would affirm its judgment.

---

[2] Section 102 (2)(A) of NEPA requires all agencies to "utilize a systematic, *interdisciplinary* approach which will *insure* the integrated use of the natural and social sciences and the environmental design arts in planning and in decisionmaking which may have an impact on man's environment." 42 U. S. C. § 4332 (2)(A). (Emphasis added.)