**NEIGHBORS ORGANIZED TO INSURE
A SOUND ENVIRONMENT, INC.,
et al.**

**v.**

**Donald ENGEN, et al.**

**No. 3–86–0913.**

United States District Court,
M.D. Tennessee,
Nashville Division.

May 29, 1987.

Bruce & Barrick, William M. Barrick,
Nashville, Tenn., for plaintiffs.

Leonard Ceruzzi, Chief Counsel, Washington, D.C., for defendant FAA.

Sam Bartholomew, Jr., Everett H. Falk, Kirk Shaffer, Stokes & Bartholomew, Nashville, Tenn., for defendants.

James Thomason, U.S. Atty., Nashville, Tenn., for U.S.

William R. Willis, Jr., Russell Willis, Willis & Knight, Nashville, Tenn., for defendant Metropolitan Airport Authority.

Gina R. Belt, Gen. Litigation Section, Land & Natural Resources Div., Washington, D.C., for defendants Engen and Administrator, FAA.

## MEMORANDUM

WISEMAN, Chief Judge.

■ NOISE[1] a Tennessee corporation has sued Donald Engen in his official capacity as Administrator of the Federal Aviation Administration and the Metropolitan Nashville Airport Authority (MNAA) seeking to enjoin increased use of Nashville Metropolitan Airport (the Airport).[2] Plaintiffs allege that the defendants have violated the National Environmental Policy Act (NEPA)[3] by failing to prepare a comprehensive environmental impact statement on the new terminal that has been built at the airport. Defendants have filed motions for summary judgment as have plaintiffs. The defendants state that there is no genuine issue of material fact; plaintiffs agree, but argue that summary judgment may be inappropriate since differing inferences may be drawn from the undisputed facts. To whatever extent this contention may have survived *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986), the Court finds it inapplicable to this case. In deciding a NEPA case the Court must determine whether on a sub-stantive level the agency has given objective, good faith consideration to the environmental effects of a proposal and whether the procedures of NEPA have been followed. *See Stryckers Bay Neighborhood Council v. Karlen,* 444 U.S. 223, 100 S.Ct. 497, 62 L.Ed.2d 433 (1980) (discussing NEPA procedure); *Grazing Fields Farm v. Goldschmidt,* 626 F.2d 1068 (1st Cir. 1980).

### Legal Background

Before turning to the specifics of the case at bar, an overview of the structure and purpose of NEPA will serve to facilitate clarity. In 1969 Congress passed NEPA

To declare a national policy which will encourage productive and enjoyable harmony between man and his environment; to promote efforts which will prevent or eliminate damage to the environment and biosphere and stimulate the health and welfare of man; to enrich the understanding of the ecological systems and natural resources important to the Nation.

42 U.S.C. § 4321. Congress established a requirement that every proposal for "major Federal action significantly affecting the quality of the human environment" include a statement on the environmental impact of the proposed action. The statement must discuss the impact, unavoidable adverse effects, alternative actions, short-versus long-term tradeoffs, and "any irreversible and irretrievable commitments of resources." 42 U.S.C. § 4332.[4] This action forcing provision ensures that federal agencies follow both the letter and the spirit of NEPA.

1. NOISE is an acronym for Neighbors Organized to Insure a Sound Environment. The organization is made up of individuals and families who live near the airport. Two individuals are also joined as plaintiffs: George Rocco and Don Maloney.

2. This site was called Berry Field in the past. MNAA owns several fields and, where necessary for clarity, the Court will refer to Nashville Metropolitan Airport as Berry Field.

3. The National Environmental Policy Act of 1969, 42 U.S.C. § 4321 et seq.

4. This statement has come to be called an Environmental Impact Statement or EIS. An EIS is required by NEPA only if the proposed action is both a major federal action and significantly affects the quality of the human environment. 42 U.S.C. § 4332(C).

Congress also established the Council on Environmental Quality (CEQ). The CEQ serves as an information gathering advisor to the President. The CEQ also promulgates regulations implementing the EIS requirement of NEPA. On March 5, 1970, the President ordered the CEQ to establish guidelines for the preparation of EIS's. Ex. Order 11514, 3 C.F.R. § 902 (1966–70). These guidelines were revised in 1973. 38 Fed.Reg. 20550. In 1979 the CEQ was directed to issue regulations governing compliance with NEPA. Ex. Order 11991, 42 F.R. 26967 (amending Ex. Order 11514, 35 F.R. 4247). The regulations became effective on July 30, 1979. 40 C.F.R. § 1500.1 et seq.[5]

Every federal agency is required to adopt procedures to supplement the CEQ regulations. 40 C.F.R. § 1507.3 (1986). The FAA has done so. FAA Order 1050.4 was approved by the CEQ in 1980. The 1983 amended version, FAA Order 1050.-4A, has also been approved. This version creates a categorical exclusion for terminals.[6]

### Undisputed Facts

The Nashville Metropolitan Airport is about six miles from downtown Nashville. In 1969 the MNAA was formed by the Tennessee General Assembly; MNAA functions independently of Metropolitan Nashville Davidson County. In 1970, MNAA retained Peat, Marwick, Mitchell & Co. to evaluate the air traffic at the airport and to consider development options for the period up to 1990. The resulting 1971 Air Trade Study and Airport's evaluation laid out a number of alternatives utilizing Berry Field, the Smyrna Airport,[7] and an entirely new site. The conclusions of the 1971 Air Trade Study are at issue in this litigation. The post-planning period forecast concluded that:

> prevailing land use patterns and land values may effectively preclude the development of the Nashville Metropolitan Airport as the major air carrier facility at some future date (most likely beyond the 1990 planning period) *unless* (a) major changes occur in the established urban development pattern of the Nashville Metropolitan Region or (b) major innovations in aircraft technology significantly reduce the noise levels generated by the turbojet aircraft fleet and therefore markedly lessen their adverse impacts on the surrounding community.

1970 Air Trade Study p. 105 (emphasis original). The Tabular Summary at issue is attached to this memorandum as Appendix 1. In the post–1990 column, that table reiterates the "effectively precluded" conclusion. The post–1990 airport that the 1971 Air Trade Study thought might be effectively precluded was one encompassing 12,000 acres and affecting 20,000 additional acres.[8]

Also in 1971 a noise study on a new runway was done[9] and long range cost estimates were prepared including a new runway and a new terminal. In October 1971 MNAA and the FAA met and discussed all of the future projects. In December 1971 Peat, Marwick finished the 1971 Air Trade Study. As a result of that study MNAA decided to continue development of the Berry Field site beyond 1990. This decision was made at an MNAA meeting on January 30, 1972. This concluded the first phase of the planning program for the airport.

---

5. The multiplicity of amendments must be kept in mind in giving CEQ interpretations of NEPA the substantial deference to which they are entitled. *See Andrus v. Sierra Club*, 442 U.S. 347, 99 S.Ct. 2235, 60 L.Ed.2d 943 (1979).

6. *See* text accompanying n. 20 *infra*.

7. MNAA acquired the Smyrna Airport in 1970. Prior to that time it had been a military airfield. MNAA also owns the Springfield airport.

8. The current airport, in 1987, encompasses less than 4,000 acres.

9. Apparently the Noice Exposure Forecast technique was used. "[T]he NEF process is a planning tool and does not properly indicate the actual amount of noise to which property lying within the calculated contours is subjected or expected to be subjected." 1973 Master Plan at 18.

Peat, Marwick was then hired to prepare a Master Plan for airport development.[10] During the preparation of the Master Plan MNAA approved the concept of a new parallel runway 7,500 feet from the existing North-South Runway and a new terminal located between the two.[11] The Master Plan was completed in October 1973 and was accepted by FAA in January, 1974.

This was the second phase of the planning process. The 1973 Master Plan concluded that a North-South 7,500 feet separated parallel runway was more desirable than Northwest-Southeast configuration because of airspace and air traffic control. The latter configuration would conflict with the Smyrna flight path. A North-South runway would require just over half the land acquisition of the Northwest-Southeast configuration. Surrounding Land Use Compatibility for both was rated "fair"; 900 residential acres would be affected by the North-South configuration, 800 by the Northwest-Southeast. The need for a new runway was projected to occur after the 1990 planning period.

The 1973 Master Plan concluded however that the existing terminal, opened in 1961, required "immediate improvement to meet even the 1975 requirements." The Plan then evaluated three alternatives: the remote aircraft parking concept and the unit terminal concept involved continued use of the 1961 terminal with modifications; the third concept involved a new terminal. The most feasible site for a new terminal, the Plan concluded, was between the existing and the future North-South runways. Of the three alternatives the new terminal site had the best post-planning period capacity; after meeting with MNAA, Peat, Marwick eliminated the unit terminal concept in preparing the Master Plan.

The Master Plan concluded that the new terminal alternative would require access from Donelson Pike rather than the existing Briley Parkway access. The Master Plan also noted that the capacity of Briley Parkway would be exceeded within the planning period and that, if the parallel runway were constructed, Donelson Pike would have to be relocated.

MNAA then undertook a Terminal Evaluation Study (1974 Study) which selected the new terminal option in the inter-runway area. The 1974 Study determined that the maximum capacity of the old terminal was 1.8 million passengers a year and that development of the new terminal should be triggered by 1.3 million passengers in a year. MNAA also developed an Off-Airport Land Use Plan in 1974. During 1975 to 1976 MNAA acquired approximately 950 acres for the parallel runway.[12] An environmental impact assessment report (EIAR) was prepared for this acquisition, which was federally funded. In 1977 further noise studies were done as part of an Airport Vicinity Plan. The Metropolitan Council adopted the Comprehensive Zoning Ordinance (COMZO) on February 24, 1978 showing the parallel runway and discouraging incompatible land use around the airport. Some taxiway work was also proposed in 1978. An EIAR was prepared for this proposed action. This concluded the third phase.

In 1978–79 the airport approached the 1.3 million passengers trigger for a new terminal which the 1973 Master Plan had established. The fourth phase then began: detailed planning of the new terminal. In 1979 a Master Plan Update was prepared (1979 Master Plan). The 1979 Master Plan selected a pier-finger terminal layout to be constructed in two phases. Phase I of the

---

**10.** It is not entirely clear whether Peat, Marwick was hired to produce the Master Plan before the decision to remain at Berry Field was made or after that decision. The 1973 Master Plan puts the date two months before the MNAA meeting. This is not an inconsistency that requires resolution, however.

**11.** The existing North-South runway is also known as Runway 2L–20R, the proposed one if built will be Runway 2R–20L. There is also an

existing parallel North-South, general aviation runway not at issue in this litigation.

**12.** Apparently this acquisition did not reflect any change in the anticipated date of need for the new runway. The 1973 Master Plan had recommended immediate acquisition of this land to pre-empt cost increases caused by development while concluding that the new runway would not be needed within the 1990 planning period.

new terminal involved two concourses and 23 gates. Phase II would add two additional concourses and either 21 or 23 gates. Phase II was planned for long range requirements past the year 2000 and was itself capable of piecemeal completion. The 1979 Master Plan called for relocation of Donelson Pike and a "discreet access system" between Donelson Pike and the new terminal. The discreet access system is a set of entry and exit ramps connecting the terminal and Donelson Pike.

In 1980 Landrum and Brown prepared an environmental assessment (EA)[13] on the new terminal. The environmental impact of the discreet access system was considered in a separate document.[14] The EA concluded "no significant impacts are anticipated to occur from the project and consequently no mitigating measures are deemed necessary." EA at V.2–2. The EA is a crucial document in this litigation. Plaintiffs allege that it is deceptive and misleading. The first alleged deception occurs on page I.1–1: "The first phase [of planning], completed in 1971, entailed preparation of an Air Trade Analysis and Airport Evaluation Study and had as its major findings: ... That the existing site of the airport should be developed as the main air carrier airport through 1990 and beyond." Plaintiffs interpret this sentence to say "the 1971 Air Trade Study concluded that the airport should remain at Berry Field past 1990." If the sentence said that it would be deceptive since the 1971 Air Trade Study expressed concern that after 1990 use of the Berry Field site might be effectively precluded. *See* p. 539 *supra*. However, the sentence says that "[T]he first phase ... had as its major findings."

The "first phase" entailed more than preparation of the 1971 Air Trade Study; it was a joint effort among three groups. The MNAA was involved in the policymaking and in supplying information. The Chamber of Commerce undertook some parallel investigation. Peat, Marwick was hired to use its professional expertise in evaluation of airport facilities. The final result of the planning by all threee groups was a MNAA vote on January 30, 1972 to remain at Berry Field. The 1980 EA capsulizes the efforts of all the planning groups during the first phase. The major result of the first phase was MNAA's decision to stay at Berry Field.

Plaintiffs next point to an alleged discrepancy between the exhibit on page I.2–4 and the table on page I.2–6. Page I.2–4 shows as the final expansion of the terminal four concourses with between 44 and 46 gates. The table lists as New Terminal Complex Requirements in 2000, 33 gates. The text introducing the exhibit and table explains the discrepancy: "The remaining concourses [Phase 2 construction] provide adequate expansion potential to meet long range (2000 and beyond) requirements for terminal and aircraft parking positions." The table only goes to 2000, not beyond. Further, a great deal of precision in prediction for a period twenty years away is not to be expected; any reliance must be reasonable.

---

**13.** An EA is used to decide whether or not a major federal action will have a significant environmental impact. 42 C.F.R. § 1508.9. Based on the EA either an environmental impact statement (EIS) is prepared or a finding of no significant impact (FONSI) is issued. The EIAR's referred to earlier are the old term for EA's; the two documents serve essentially the same purpose. It is also possible that a major federal action will be categorically excluded from environmental documentation. A categorical exclusion is "a category of actions which do not individually or cumulatively" have a significant environmental impact. 40 C.F.R. § 2508.4. If a major federal action falls under a categorical exclusion, no documentation will be prepared.

**14.** There was some effort to establish a lead and cooperating agency arrangement for the two projects between FAA and the Federal Highway Administration, but procedural difficulties within the FHWA precluded this arrangement. Under 42 C.F.R. §§ 1501.5 and 1501.6 a cooperating agency statement undoubtedly would have been proper. Whether it was required, so as to be arbitrary and capricious not to use that mechanism, is an entirely different question, especially since the EA has an extensive discussion of the FHWA's EA. *See Aberdeen & Rockfish Rail Co. v. SCRAP*, 422 U.S. 289, 321, 95 S.Ct. 2336, 45 L.Ed.2d 191, 219–20 (1975) (consideration of environment effects in a separate, specialized proceeding more suited to specific impact on recyclables and consistent with NEPA); *Crounse v. ICC*, 781 F.2d 1176 (6th Cir.1986).

The third and final deception plaintiffs have alleged occurs on page II.1-3. This is a table adapted from pages 106-7 of the 1971 Air Trade Study.[15] Three entries that appeared on the 1971 table do not appear on the 1980 table. The 1971 table had a date line delimiter at the top which was eliminated in the 1980 table. The post-1990 column in the 1971 table was eliminated and footnote c which referred to that column was eliminated.[16] Basically, those conclusions of the 1971 Air Trade Study that went beyond 1990 planning period mandate for the Air Trade Study were excised from the table. The conditions obtaining in 1971[17] and on which the post-1990 projections were then based did not remain static until 1980. Had the column been included, the table probably would have been more not less misleading.

Plaintiffs also allege that use of the table to show economic feasibility was deceptive since, as footnote b plainly says, the 1971 economic analysis was predicated on expansion of the existing terminal not on building a new terminal. Nonetheless, the 1971 Air Trade Study only considered remodeling of the old terminal and it was on that assumption that MNAA decided to stay at Berry Field. Only later developments revealed that long range costs indicated a new terminal, rather then renovation. As an historical overview, the table and the text on II.2-1 are accurate. In the simple, factual sense plaintiff's allegation of deception are unfounded. It should also be noted that the parallel runway is shown on the map exhibits to the EA, and is included as a factor in the alternative discussion even though the forecast and date of need was post-1990.

The 1980 EA was circulated to other government agencies to ensure that the plan was consistent with any other governmental plans for the area. When completed the EA was also sent to the EPA[18] and to the Department of Interior. On July 20, 1981, the FAA issued a FONSI.[19] On March 9, 1982, site preparation began.

In 1985 the conditions on which a forecast of post-2000 need for all four conc-

15. The two tables are annexed to this memorandum as Appendices 1 and 2.

16. Nothing in the record discloses why the column was eliminated. However, the task of the Court is not to inquire into the subjective but rather the objective effect of the EA. *See Stryckers Bay Neighborhood Council v. Karlen,* 444 U.S. 223, 100 S.Ct. 947, 62 L.Ed.2d 933 (1980).

17. The 1971 conclusion was based on continued development without the sort of planning that led to COMZO and on no noise abatement. In 1979 Congress passed the Aviation Safety and Noise Abatement Act and the FAA promulgated regulations requiring a phased-in noise abatement program.

18. Shortly before this lawsuit was filed EPA sent a letter to FAA asserting that the EA had not been sent to EPA and pointing out numerous deficiencies in the EA. A second EPA letter slightly modified the first. Nonetheless, the record clearly shows that the draft EA was sent to EPA on April 27, 1981 and EPA concurred in the EA's conclusion of no significant impact on June 1, 1981. The deficiencies pointed to are, therefore, ones of substance not procedure. The substantive contents of NEPA documents are within the special expertise of the FAA. While the EPA may now know of some substantive deficiencies, the Court's review of substan-

tive deficiencies is limited to the arbitrary and capricious standard. The question then is whether the FAA had a rational basis for the conclusions in the EA. *See Crounse v. ICC,* 781 F.2d 1176 (6th Cir.1986); *Boles v. Orton Dock, Inc.,* 659 F.2d 74 (6th Cir.1981) (arbitrary and capricious standard of review of decision not to prepare EIS); *Ocoee River Council v. TVA,* 540 F.Supp. 788 (E.D.Tenn.1981) (arbitrary or clearly gave insufficient weight to environmental values).

19. The conclusion of the EA and the rationale of the FONSI depended in part on the absence of any public opposition. Had plaintiffs participated in the public hearings on the 1980 EA or inquired into the FONSI they could have made their opposition known at a more meaningful point. Notice of the FONSI was published in the July 26, 1981 edition of The Tennessean. Although laches is a disfavored defense in environmental litigation, its application to this case would almost certainly be proper. The Court does not reach this defense in light of the resolution of each of plaintiffs' claims. Nonetheless as the Supreme Court noted in *Baltimore Gas & Electric Co. v. NRDC,* 462 U.S. 87, 103 S.Ct. 2246, 76 L.Ed.2d 437, 453 (1983), those who wish to participate in an agency's NEPA procedures have a duty "to structure their participation so that it is meaningful, so that it alerts the agency to [their] positions and contentions." Plaintiffs failed in that duty in this case.

ourses of the new terminal and of post–1990 need for a parallel runway were basically changed. In March 1985 Wesley Kaldahl and Charles Griffith of American Airlines approached MNAA about a regional hub at Nashville. Although American had not yet made a final decision, American wanted to have the option of influencing the ongoing terminal construction. American Airlines decided on June 3, 1985 to locate a hub in Nashville if all four concourses of the new terminal were built immediately and if MNAA would begin the process of building the parallel runway. MNAA agreed to both conditions. The American Airlines' announcement was made on June 5, 1985. No new EA was prepared on the terminal expansion.[20] FAA decided to begin an EIS on the runway immediately, without the preliminary step of an EA. *See* note 13 *supra.* Even though neither the new terminal nor the new runway is yet available, hubbing operations began in April 1986. Plaintiff NOISE was formed in the summer of 1986. This lawsuit was filed on October 24, 1986. On October 24, 1986 contracts had been awarded for over $96 million and $54 million or about 45 percent of the total had been paid for work completed. The terminal is now essentially complete and opening is targeted for four months from now.

### The Pending Motions for Summary Judgment

All parties have moved for summary judgment. Plaintiffs base their motion on four points. First, plaintiffs argue that the 1980 EA should have dealt with the parallel runway and that failure to include it resulted in unlawful segmentation. Second, plaintiffs argue that the 1980 EA failed to comply with 42 U.S.C. § 4332 in its treatment of alternatives. Third, by building the terminal without complying with NEPA the defendants are said to have irretrievably committed resources in violation of 42 U.S.C. § 4332. Finally, plaintiffs argue that the 1980 EA should have been supple-

mented when American Airlines announced the hub.

Defendants have moved for summary judgment first arguing that none of plaintiffs' contentions are true and second urging that even if any were laches would bar suit at this late date.

### Alleged Deficiencies in the 1980 EA

█ It is plaintiffs' position that defendants have avoided complying with NEPA by taking small steps on a journey to the larger goal and by treating those small steps as independent and unrelated. Addressing the environmental impact of the terminal without addressing the parallel runway in the same document is an example of this according to plaintiffs. Defendants counter that in 1980 the need for a parallel runway was so far distant that the effect could not be assessed and the project was hypothetical. No environmental documentation is required by NEPA for hypothetical actions. *Weinberger v. Catholic Action of Hawaii,* 454 U.S. 139, 102 S.Ct. 197, 70 L.Ed.2d 298 (1981). Defendants also argue that the terminal and the runway have independent utility so as not to be connected actions within the meaning of 40 C.F.R. § 1508.25(a)(1).

Plaintiffs counter defendants' "hypothetical" argument by pointing to the long history of the parallel runway plan and to certain engineering realities. The elevation of the parallel runway and of the terminal must be compatible. Because of cost this means that the elevation of the terminal must be adjusted, not the elevation of the runway. The elevation of the parallel runway determined the elevation of the terminal. The separation between the two North-South runways was set. The layout is part of the COMZO.

█ Clearly, it was not impossible to assess the environmental effects of the parallel runway in 1980 because it was not "hypothetical" in 1980. Barring a substantial change in circumstances, which hindsight reveals not to have occurred, every-

---

**20.** The current FAA regulations categorically exclude terminals. *See* p. 539 *supra,* and note 6

*supra.*

thing except the "when" of the parallel runway was known in 1980. However, it is not the ability to assess environmental effects, but the requirement that they be assessed that is before the Court. Environmental documents must be prepared on "proposals" only. *Kleppe v. Sierra Club*, 427 U.S. 390, 96 S.Ct. 2718, 49 L.Ed.2d 576 (1976). A " '[p]roposal' exists at that stage in the development of an action when an agency ... has a goal and is actively preparing to make a decision on one or more alternative means of accomplishing that goal and the effects can be meaningfully evaluated." 40 C.F.R. § 1508.23. In 1980 the old terminal was insufficient to meet Nashville's needs. The airfield was adequate for the foreseeable future; the terminal was not. Therefore, the goal was to solve the terminal problem and the proposal was to build a new terminal.

The FAA which was providing funds for parts of the new terminal had to consider the "alternative means of accomplishing the goal." 42 U.S.C. § 4332(2)(F) requires that agencies "study, develop and describe appropriate alternatives, ... [for] any proposal which involves unresolved conflicts concerning alternative uses of available resources" even if an EIS is not required under section 4332(2)(C). *See* 40 C.F.R. § 1508.9(3)(b). To ascertain if conflicts would exist FAA used the EIS alternatives requirements established by the CEQ in preparing the EA. The alternatives to be considered in an EIS are defined in 40 C.F.R. § 1508.25(b): "(1) No action alternative. (2) Other reasonable courses of actions. (3) Mitigation measures (not in the proposed action)." The 1980 EA considered no action, moving the airport to an entirely new site, two versions of renovating the old terminal, and the new terminal that MNAA proposed. Since no significant impact was forecast no mitigation measures were discussed: "no significant impacts are anticipated to occur from the project and consequently, no mitigating measures are deemed necessary." 1980 EA at V.2–2.

■ Plaintiffs argue that rejection of the entirely new airport alternative was based on a deceptive treatment of the 1971 Air Trade Study. Although that section may not be a model of clarity, it is not deceptive. The Court's review of an agency decision that the alternative of moving the airport was not reasonable and prudent is limited to determining whether the rejection was arbitrary and capricious. The Court is not to substitute its own judgment about the best outcome. *Vermont Yankee Nuclear Power Corp.*, 435 U.S. 519, 98 S.Ct. 1197, 55 L.Ed.2d 460 (1978). MNAA, not a federal agency, had decided in 1972 to stay at Berry Field. The FAA in evaluating the proposal to build a new terminal was faced with a long-standing decision implemented with comprehensive planning. It would not be reasonable or prudent to radically change that planning when apparently no adverse environmental impacts were associated with pursuing it. The conclusion of the rest of the EA was that the proposal to build a new terminal would have no significant impact. No "unresolved conflicts concerning alternative uses of available resources". appeared. Therefore, the Court concludes that it was not arbitrary and capricious to eliminate from further study the alternative of moving the airport to another site.

■ Plaintiffs argue that the scope of the EA was improper because it did not include the parallel runway. If separate actions are either connected or cumulative an EA, in order to "[b]riefly provide sufficient evidence and analysis for determining whether to prepare an environmental impact statement," 40 C.F.R. § 1508.9(a)(1) (definition of an EA), should address both actions. FAA Order # 5050.4, 45 F.R. 56620 (Aug. 25, 1980). The Court must therefore determine if the terminal and the parallel runway were either connected or cumulative actions.

Actions are connected if they "(i) automatically trigger other actions which may require environmental impact statements. (ii) cannot or will not proceed unless other actions are taken previously or simultaneously. (iii) are interdependent parts of a larger action and depend on the larger action for their justification." 40 C.F.R.

§ 1508.25(a)(1). In oral argument defendant MNAA took the position that terminals and runways are never connected since they have independent utility. That position is intuitively fallacious. Sometimes they are and sometimes they are not. 4,000 acres of totally undeveloped land will not be an airport unless someone builds both a terminal and a runway. However, an airport may have a superfluity of airside capacity but inadequate terminal capacity. The need for a new terminal in that case is entirely unrelated to runways that might be built later. There is a direct correlation between airside and groundside capacity, but it is a correlation exhibiting some elasticity. In 1980 the airport had enough runway to handle the passengers, but not enough terminal. The new terminal did not "trigger" the new runway, did not require a new runway to be built "previously or simultaneously," and did not depend on implementation of the 1973 Master Plan for its "justification." Giving the CEQ's interpretation of connected actions the substantial deference due it, the terminal and the runway are not connected actions. *See Andrus v. Sierra Club*, 442 U.S. 347, 99 S.Ct. 2335, 60 L.Ed.2d 943 (1979).

Cumulative actions are two proposed actions which together may have an environmental impact. As noted earlier, the only proposal was for a terminal. The parallel runway was not proposed and therefore could not be part of a cumulative action.

Plaintiffs also argue that cumulative impacts should have been considered in the EA. Cumulative impacts, according to the CEQ, result "from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions." 40 C.F.R. § 1508.7. Plaintiffs contend that the runway was a reasonably foreseeable future action. In 1980 a new runway was contemplated. A substantial amount of planning had been expended to ensure that the possibility of building a new runway was not precluded by other developments. However, the need for a new runway was thought to be at least 10 years distant. The 1980 EA stated over and over that no airside expansion was planned within the foreseeable future.

FAA Order 5050.4, Chapter 10, ¶ 102 provides that the impacts of projects to be begun more than three years in the future cannot be meaningfully evaluated. Although three years may be an unreasonably brief time in some circumstances, in this case the runway was ten years distant. The decision of the FAA to exclude the necessarily speculative impacts of so distant an action cannot be termed arbitrary and capricious.

*Decision Not to Supplement in 1985*

When American Airlines announced the regional hub, MNAA made substantial changes in the construction plans for the new terminal. The number of gates and square footage was doubled from the Phase I plan being built. The increase was roughly 30 percent over the projected year 2000 need and represented the full expansion projected in the 1980 Master Plan Update. Plaintiffs argue that this expansion requires supplementation of the 1980 EA.

■ The CEQ regulations require a supplement to EIS's if the "agency makes substantial changes in the proposed action that are relevant to environmental concerns [or] ... significant new circumstances or information relevant to environmental concerns or information relevant to environmental concerns and bearing on the proposed action or its impacts" develops. 40 C.F.R. § 1502.9(c). Even assuming that the supplementation provisions would apply to EA's as well as to EIS's, they would not apply to the terminal EA. In FAA Order 5050.4A Chapter 3 ¶ 23(a)(4), the FAA categorically excluded passenger terminals from environmental analysis. No formal environmental assessment is required for "[c]onstruction or expansion of passenger handling facilities." FAA Order 5050.4A, Ch. 3 ¶ 23(a)(4). There are exceptions to categorical exclusions. For instance, if an action is "highly controversial on environmental grounds," the categorical exclusion does not apply. *Id.* ¶ 24. However, as the plaintiffs' delay in bringing this suit makes clear, it is not construction of the terminal, which is the federal action, but rather the increased flights occasioned

by the American hub that is controversial. American Airlines' actions are not federal actions.

Therefore, under the FAA Order, terminal redesign could not trigger a supplementation requirement. Obviously the impact of the new runway had to be evaluated. The EIS on the new proposed runway will take into account the cumulative effect of all prior actions. The Sixth Circuit in *Crounse v. ICC*, 781 F.2d 1176 (6th Cir. 1986), held that the ICC was not required to assess the impact of planned facilities when the proposal before the agency was for a merger. Even though the merger would not be desired if the facilities were not built the court held that disapproval of the facilities was a risk the new company would have to take. An EIS would be prepared on the facilities when they were proposed. This is consistent with the procedure approved in *Aberdeen & Rockfish*

*Rail Co. v. SCRAP*, 422 U.S. 289, 95 S.Ct. 2336, 45 L.Ed.2d 191 (1975). In *Aberdeen* the ICC had undertaken environmental review in a second proceeding that was focused on those aspects of the ICC action which were likely to have an environmental impact, after deciding in the first, more general proceeding to issue a FONSI.

The FAA's decision to move directly to a complete EIS on the runway without delaying progress on the terminal cannot be called arbitrary and capricious under the circumstances of this case.[21]

*Conclusion*

The undisputed facts defeat each of plaintiffs' claims of NEPA violation. Therefore, defendants' motions for summary judgment are granted, and plaintiffs' denied.

---

21. Plaintiff's argument that FAA has irretrievably committed resources without complying with NEPA is dependent on an underlying violation of NEPA. Given the resolution of each of the predicate allegations, this claim also fails.

APPENDIX 1

Table 41

RECAP COMPARISON OF AIRPORTS AND ALTERNATIVE DEVELOPMENT PROGRAMS
1971 to 1990 Period

| Alternative | | Airspace/ Air Traffic Control | Aircraft Delays [a] ($ million) | Terminal Complex | Other Building Areas | Access Road Requirements | Development Costs [b] ($ million) | Compatibility with Surrounding Land Use | Post-1990 Period [c] Long-Range Development Potential | |
|---|---|---|---|---|---|---|---|---|---|---|
| Number | Description | | | | | | | | Airport Site | Rating |
| 1 | Accommodate all aviation activity at Nashville Metropolitan Airport; convert Smyrna Airport to nonaviation uses. | Good | $0 | Satisfactory | Satisfactory | Satisfactory | $24.4 | Fair | Nashville Metropolitan Airport | Effectively precluded |
| 2 | Accommodate all aviation activity at Smyrna Airport; convert Nashville Metropolitan Airport to nonaviation uses. | Good | 0 | Satisfactory | Satisfactory | Satisfactory | 35.7 | Good | Smyrna Airport | Good |
| 3. | Accommodate all air carrier activity and 10% of general aviation activity (includes air taxi, emergency, and other essential operations) at Nashville Metropolitan Airport; all other general aviation activity at Smyrna Airport. | Good | 2 | Satisfactory | Satisfactory | Satisfactory | 24.8 | Fair | Hypothetical New Airport | Good |
| 4. | Accommodate all air carrier activity and 10% of general aviation activity at Smyrna Airport; all other general aviation activity at Nashville Metropolitan Airport. | Good | 2 | Satisfactory | Satisfactory | Satisfactory | 44.6 | Good | | |
| 5. | Accommodate all air carrier activity and approximately half of general aviation activity at Nashville Metropolitan Airport with the remaining general aviation activity at Smyrna Airport. | Good | 2 | Satisfactory | Satisfactory | Satisfactory | 24.8 | Fair | | |
| 6. | Develop a new airport in the Nashville area to serve all aviation activity, convert Nashville Metropolitan Airport and Smyrna Airport to nonaviation uses. | Good | 0 | Satisfactory | Satisfactory | Satisfactory | 50.4 | Good | | |

a. Present value of difference in aircraft delay costs between Alternatives 3, 4, or 5 and Alternatives 1, 2, or 6; interest rate = 8%; base year 1972.
b. Present value of direct costs; interest rate = 8%; base year 1972 (from Table 39); assumes existing terminal facilities to be expanded for use through 1990.
c. Not specifically related to alternatives; based on costs in Table 40.

Source: PMM.

APPENDIX 2
TABLE II.1-1

Nashville Metropolitan Airport

RECAP COMPARISON OF AIRPORTS ALTERNATIVE DEVELOPMENT PROGRAMS

| Number | Description | Airspace/ Air Traffic Control | Aircraft Delays[a] ($ million) | Terminal Complex | Other Building Areas | Access Road Requirements | Development Costs[b] ($ million) | Compatibility with Surrounding Land Use |
|---|---|---|---|---|---|---|---|---|
| 1 | Accommodate all aviation activity at Nashville Metropolitan Airport; convert Smyrna Airport to nonaviation uses. | Good | $0 | Satisfactory | Satisfactory | Satisfactory | $24.4 | Fair |
| 2 | Accommodate all aviation activity at Smyrna Airport; convert Nashville Metropolitan Airport to nonaviation uses. | Good | 0 | Satisfactory | Satisfactory | Satisfactory | 35.7 | Good |
| 3 | Accommodate all air carrier activity and 10% of general aviation activity (includes air taxi, emergency, and other essential operations) at Nashville Metropolitan Airport; all other general aviation activity at Smyrna Airport. | Good | 2 | Satisfactory | Satisfactory | Satisfactory | 24.8 | Fair |
| 4 | Accommodate all air carrier activity and 10% of general aviation activity at Smyrna Airport; all other general aviation activity at Nashville Metropolitan Airport. | Good | 2 | Satisfactory | Satisfactory | Satisfactory | 44.6 | Good |
| 5 | Accommodate all air carrier activity and approximately half of general aviation activity at Nashville Metropolitan Airport with the remaining general aviation activity at Smyrna Airport. | Good | 2 | Satisfactory | Satisfactory | Satisfactory | 24.8 | Fair |
| 6 | Develop a new airport in the Nashville area to serve all aviation activity, convert Nashville Metropolitan Airport and Smyrna Airport to nonaviation uses. | Good | 0 | Satisfactory | Satisfactory | Satisfactory | 50.4 | Good |

a. Present value of difference in aircraft delay costs between Alternatives 3, 4, or 5 and Alternatives 1, 2, or 6; interest rate = 8%.
b. Present value of direct costs; interest rate = 8%; base year 1972 (from Table 39); assumes existing terminal facilities to be expanded for use through 1990.

Source: Air Trade Study and Airports Evaluation, 1971.