878 F.2d 174
 NEIGHBORS ORGANIZED TO INSURE A SOUND ENVIRONMENT, INC.,
Plaintiff-Appellant,
v.
T. Allan McARTOR, in his official capacity as Administrator,
Federal Aviation Administration; and Metropolitan
Nashville Airport Authority, Defendants-Appellees.
 No. 87-5693.
 United States Court of Appeals,
Sixth Circuit.
 Argued Dec. 11, 1987.
Decided June 29, 1989.
 
 William M. Barrick argued, Nashville, Tenn., for plaintiff-appellant.
 William R. Willis, Jr. argued, Russell Willis, James C. Thomason, III, U.S. Attys. Office, Nashville, Tenn., Angus E. Crane argued, U.S. Dept. of Justice, Washington, D.C., Robert L. Klarquist, for defendants-appellees.
 Paul S. Davidson, Stokes & Bartholomew, P.A., Nashville, Tenn., Everett H. Falk, for Metropolitan Nashville Airport Authority.
 Before JONES and GUY, Circuit Judges, and LIVELY, Senior Circuit Judge.*
 NATHANIEL R. JONES, Circuit Judge.
 
 
 1
 In this action under the National Environmental Policy Act ("NEPA"), 42 U.S.C. Sec. 4321 et seq., plaintiff-appellant Neighbors Organized to Insure a Sound Environment ("NOISE") appeals from the summary judgment entered for defendants-appellees T. Allan McArtor, Administrator of the Federal Aviation Administration ("FAA"), and the Metropolitan Nashville Airport Authority ("MNAA"). The district court held that defendants complied with the NEPA by preparing a sufficiently comprehensive environmental assessment ("EA") for the construction of a new terminal at the Nashville Airport. For the reasons that follow, we find that this case is moot.
 
 I.
 
 2
 The district court opinion efficiently distilled a voluminous record and described in detail the airport expansion. Therefore, we summarize briefly the undisputed facts. NOISE is a not-for-profit Tennessee corporation whose membership is comprised largely of persons populating land tracts adjacent to the Metropolitan Nashville Davidson County Airport ("Metro Airport" or "Airport"). Defendant MNAA was created in 1969 by the Tennessee General Assembly, and is located in Nashville-Davidson County. MNAA owns and operates the Metro Airport, which is located approximately six miles southeast from downtown Nashville, and is responsible for planning and satisfying the air transportation needs of the greater Nashville area. Defendant T. Allan McArtor is the Administrator of the FAA, which is responsible for approving and funding airport expansion and development projects.
 
 
 3
 In 1971, the MNAA commenced a large-scale planning project designed to assess the future air transportation requirements of the greater Nashville area and to consider alternative sites for airport development. In order to complete this planning study, MNAA contracted with Peat, Marwick and Mitchell ("Peat Marwick") to prepare a comprehensive planning document ("Air Trade Study"). The Air Trade Study detailed the mix of facilities, property and services required to satisfy projected demand in the planning phase. The planning project was funded in part by the FAA, pursuant to Section 13 of the Airport and Airway Development Act of 1970. 49 U.S.C. Sec. 1701 et seq. (repealed 1982). The submission of a "Master Plan" to the FAA and its subsequent approval by the FAA is a prerequisite for federal funding.[1]
 
 
 4
 The Air Trade Study developed a long-range model for the region which included development strategies for the 1990 planning period and predictions for the post-1990 period. The following three criteria were employed by Peat, Marwick in preparation of the report: 1) that the site be adaptable to long-term expansion within its own boundaries; 2) that the site be compatible with future land use with the adjacent areas, with the primary emphasis on the impact of aircraft noise; and 3) that potential requirements beyond the post-planning period be considered in any site plan or alternative. Joint Appendix B at 104. The Air Trade Study made a series of conclusions and recommendations, which included that:
 
 
 5
 1. The most efficient and economical airline airport development program for the Nashville Metropolitan Region involves retention of air carrier activities at Nashville Metropolitan Airport so long as the existing airfield and terminal facilities can be used efficiently. The existing airfield is adequate to accommodate forecast air traffic demand throughout the 1990 planning period. Terminal facilities, on the other hand, must be expanded as soon as possible to accommodate immediate needs.
 
 
 6
 2. Prevailing land use patterns and environmental considerations may effectively preclude the development of the existing Nashville Metropolitan Airport for airline activity at some future date (most likely beyond the 1990 planning period) unless (a) major changes occur in the established urban development pattern of the Nashville Metropolitan Region, or (b) major innovations in aircraft technology significantly reduce the noise levels generated by the turbojet aircraft fleet and therefore markedly lessen their adverse impact on the surrounding community.
 
 
 7
 Joint Appendix Exhibit B at 109. The study also recommended long-range alternatives to the Metro Airport, including the development of Smyrna Airport,[2] and the possibility of a new airport site.
 
 
 8
 In 1971, several studies were prepared regarding the possible expansion of the Metro Airport. MNAA administered a noise impact analysis for a future parallel runway. MNAA also conducted research regarding cost projections for further expansion at the Airport. The Nashville Chamber of Commerce commissioned an additional study, and MNAA engineers produced an in-house report. In January 1972, MNAA decided to continue development of the existing facility beyond the 1990 planning period.
 
 
 9
 MNAA requested that Peat Marwick assist in preparing a Master Plan for submission to the FAA. The Master Plan was completed in 1973, and was subsequently approved by the FAA in 1974. The Master Plan stated that the existing terminal complex required immediate improvements to manage the operational deficiencies and to satisfy 1980 passenger load requirements. Alternatives were advanced for the terminal complex development at Metro Airport. The Master Plan recommended either the expansion of the existing terminal complex on the existing terminal site or development of a completely new terminal complex or a new terminal site. The Master Plan further stated that because the existing terminal facility had passenger load constraints relative to future demand, an area between the north-south runways had been reserved should MNAA elect the latter option. Finally, the Master Plan noted that "no major airfield improvements (new runways) are contemplated in the [1990] forecast period...." Joint Appendix Exhibit C at 36. At the same time MNAA was developing a Master Plan, it approved the idea of building a new terminal site between the north and south runways. MNAA approved the north-south runway option because of greater land use efficiency and airspace considerations.
 
 
 10
 Another plan called the "Terminal Evaluation Study" was initiated and completed by MNAA in 1974. The Terminal Evaluation Study stated that MNAA's long-term planning objectives could only be satisfied through the development of a new terminal complex. This study observed that existing terminal facilities had critical operational deficiencies which required interim improvements. Further, the study urged that once the existing terminal crossed the 1.3 million passenger threshold, MNAA should proceed with development of the new terminal complex.
 
 
 11
 MNAA developed a land use plan which assisted in the planning of the new parallel runway. In 1975, MNAA initiated a program, based on the Master Plan, to purchase or condemn almost 950 acres of property east of the Airport. The Master Plan stated that the lots in that area were "largely unimproved at the present time" but continued that "if the demand for [these] lots continues as expected, this part of Davidson County may be fully developed for residential use by the end of the current decade." Joint Appendix Exhibit C at 36. An environmental impact assessment report was furnished for this program, and MNAA obtained an amendment to the "Comprehensive Zoning Ordinance" which discouraged development of any project inconsistent with Airport activities within a reasonable area of the Airport.
 
 
 12
 Planning for the new terminal complex commenced sometime in 1978-1979, when the existing terminal approached the 1.3 million passenger mark. In 1979, MNAA completed an update to the Master Plan which stated that the new terminal would be pier-shaped and that it would be constructed in two stages. In 1980, Landrum and Brown, Inc., prepared an EA for the proposed terminal. The 1980 EA found that "no significant impacts are anticipated to occur from the project and consequently no mitigating measures are deemed necessary." Joint Appendix Exhibit E at V.2-2. In July 1981, after review by various governmental agencies, including the Environmental Protection Agency, the FAA issued a finding of "no significant [environmental] impact" for the new terminal. In March 1982, after filing of a public notice, MNAA issued notice that it would proceed with the terminal construction.
 
 
 13
 MNAA proceeded with construction of the new terminal complex in March 1982. In March 1985, American Airlines ("American") notified MNAA of its plan to operate a hub out of Nashville. However, American agreed to locate its hub operations at Metro Airport only if MNAA immediately constructed four concourses at the new terminal complex, and started development of the parallel runway. Both conditions were granted by MNAA. The terminal is now completed and service commenced in September 1987.
 
 
 14
 On October 24, 1986, NOISE filed this action in the United States District Court for the Middle District of Tennessee. In the complaint, NOISE claimed that MNAA and the FAA failed to comply with the NEPA by not preparing a comprehensive environmental impact statement ("EIS") in connection with the airport expansion at Metro Airport. Plaintiff requested expedited discovery in the matter, which was granted by the district court on November 11, 1986. Also, NOISE requested that the district court issue a preliminary injunction requiring immediate cessation of all airport construction until the defendants complied with NEPA requirements, including the preparation of a comprehensive EIS and an appraisal of the alternatives for air transportation in the region. In early 1987, both parties moved for summary judgment. Prior to oral argument on these motions, NOISE amended its request for relief. NOISE sought an injunction against the release of federal funds for the airport expansion until an EIS was approved by the FAA, and also sought to prohibit expansion of the terminal beyond 27 gates, and limit commercial traffic at the airport to October 1986 levels. On May 28, 1987, the district court granted defendants' motion for summary judgment, 665 F.Supp. 537 (1987). A timely notice of appeal followed on June 15, 1987.
 
 II.
 
 15
 NOISE argues that the defendants violated the NEPA because the EA prepared in 1980 allegedly failed to consider in a comprehensive manner the effects of the construction of the new terminal, and all other projects associated with the airport expansion that were foreseeable at that time. However, because the activities which NOISE sought to enjoin have already occurred, and because NOISE has not demonstrated that the issues involved in this case are capable of repetition, we conclude that this appeal should be dismissed as moot.
 
 
 16
 In applying the mootness doctrine, the Supreme Court has stated that for a case to be justiciable:
 
 
 17
 [t]he controversy must be definite and concrete, touching the legal relations of parties having adverse legal interests.... It must be a real and substantial controversy admitting of specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts.
 
 
 18
 Aetna Life Ins. Co. v. Haworth, 300 U.S. 227, 240-41, 57 S.Ct. 461, 463-64, 81 L.Ed. 617 (1937) (citation omitted). See also DeFunis v. Odegaard, 416 U.S. 312, 316, 94 S.Ct. 1704, 1075-06, 40 L.Ed.2d 164 (1974). In Romulus v. County of Wayne, 634 F.2d 347, 348-49 (6th Cir.1980), plaintiffs requested an injunction to prevent construction of an airport runway, arguing that the government's planning studies were improperly prepared and misleading, and that the government failed to reevaluate the runway project after drafting the addendum. The defendant in Romulus had prepared an EIS for the runway, and had supplemented the EIS after the district court determined that the statement was inadequate and enjoined federal funding. After the supplemental EIS was filed, the district court dissolved the injunction and the plaintiffs appealed from that decision. This court held that the action was moot because (1) the runway was finished and (2) it had not been argued that there was a threat that the government's action could be repeated to cause injury to plaintiffs. We stated in Romulus that "[t]he activities which plaintiffs seek to enjoin are over, and we are not in position to prevent what has already occurred." Id. at 348.
 
 
 19
 In the instant case, we agree with defendants that the issue on appeal is moot because the terminal is completed and operational and because "we are not in position to prevent what has already occurred." Moreover, because NOISE has not demonstrated that defendants' actions in this case are " 'capable of repetition yet evading review,' " DeFunis, 416 U.S. at 318-19, 94 S.Ct. at 1707 (quoting Southern Pacific Terminal Co. v. ICC, 219 U.S. 498, 515, 31 S.Ct. 279, 283, 55 L.Ed. 310 (1911)), we conclude that this case has become moot.
 
 
 20
 Even if this court were to find that a live controversy exists in this case, there is no merit to plaintiff's claims on appeal. We review an agency's decision not to prepare an EIS under the arbitrary and capricious standard. Crounse Corp. v. ICC, 781 F.2d 1176, 1193 (6th Cir.), cert. denied, 479 U.S. 890, 107 S.Ct. 290, 291, 93 L.Ed.2d 264 (1986). It is not the task of this court to substitute our judgment for that of the agency, whether the agency's decision relates to procedure or substance. Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Counsel, 435 U.S. 519, 548-49, 98 S.Ct. 1197, 1213-15, 55 L.Ed.2d 460 (1978). Rather, this court need only determine whether the agency has adequately reviewed the issue and taken a "hard look" at the environmental impact of its decision. Kleppe v. Sierra Club, 427 U.S. 390, 410 n. 21, 96 S.Ct. 2718, 2730 n. 21, 49 L.Ed.2d 576 (1976); Crounse, 781 F.2d at 1193. See generally Sunstein Deregulation and the Hard-Look Doctrine, 1983 SUP.CT.REV. 177.
 
 
 21
 Having reviewed the record in this case, we believe that the FAA conducted a thoroughly and carefully considered EA of the impact of the new terminal complex. Moreover, because the runway was not reasonably foreseeable in 1980, and because there will be a separate EIS for that runway, the FAA's decision to decline further examination of the impact of the runway was not arbitrary and capricious. In addition, because NOISE has not demonstrated that defendants overlooked some plausible alternative airport site, the district court properly concluded that it was not arbitrary or capricious for defendants not to conduct further study of alternatives to moving the airport site. See River Road Alliance v. Corps of Eng. of U.S. Army, 764 F.2d 445, 452-53 (7th Cir.1985), cert. denied, 475 U.S. 1055, 106 S.Ct. 1283, 89 L.Ed.2d 590 (1986) (further study of alternatives not required unless plaintiff is prepared to show that a plausible alternative site was overlooked). Finally, we reject NOISE's claim that the EA that was prepared in 1980 contains statements which are deceptive and misleading.
 
 III.
 
 22
 Because this appeal has become moot, we VACATE the district court's order so that it " 'will have no legal consequences.' " United States v. Cleveland Electric Illuminating Co., 689 F.2d 66, 68 (6th Cir.1982) (quoting United States v. Munsingwear, 340 U.S. 36, 41, 71 S.Ct. 104, 107, 95 L.Ed. 36 (1950)). This case is REMANDED to the district court to be dismissed on mootness grounds.
 
 
 
 *
 The Honorable Pierce Lively took senior status effective January 1, 1989
 
 
 [1]
 A Master Plan is a document which provides, for planning purposes and information, the layout plan, feasibility studies, surveys and other planning studies as may be necessary to determine the transportation requirements for a particular airport
 
 
 [2]
 Smyrna Airport is situated at the site previously occupied by the Stewart Air Force Base, located approximately twenty miles southeast of downtown Nashville and a few miles outside of the town of Smyrna