**FRIENDS OF FIERY GIZZARD; Sierra Club; Tennessee Scenic Rivers Association; and Tennessee Citizens for Wilderness Planning, Plaintiffs–Appellants,**

v.

**FARMERS HOME ADMINISTRATION; David Seivers, State Director of Farmers Home Administration; Town of Tracy City; and Charles Fults, Mayor of Tracy City, Defendants–Appellees.**

No. 94–6327.

United States Court of Appeals, Sixth Circuit.

Argued March 31, 1995.

Decided Aug. 7, 1995.

502

W. Edward Ramage (argued and briefed), Farris, Warfield & Kanaday, Nashville, TN, for Friends of Fiery Gizzard, Sierra Club, Tennessee Scenic Rivers Assoc., Tennessee Citizens for Wilderness Planning.

Michael L. Roden, Asst. U.S. Atty. (briefed), Nashville, TN, John M. Ebersole (argued), U.S. Dist. Attorney's Office, Office of Gen. Counsel, Atlanta, GA, for Farmers Home Admin.

Michael L. Roden, Asst. U.S. Atty., Nashville, TN, for David Seivers.

Bennett L. Ross (argued and briefed), Jessalyn Hershinger, Bass, Berry & Sims, Nashville, TN, for Town of Tracy City and Charles Fults.

Before: JONES, NELSON, and RONEY,* Circuit Judges.

DAVID A. NELSON, Circuit Judge.

Where a detailed "environmental assessment" prepared by the Farmers Home Administration concludes that a water impoundment and treatment project to be funded by the agency will have no significant adverse effects on the human environment, does the fact that people served by the project will enjoy the benefit of an improved water sup-

---

* The Honorable Paul H. Roney, United States Circuit Judge for the Eleventh Circuit, sitting by designation.

ply mean that the agency must prepare a full-scale environmental impact statement that would not otherwise be required? Answering this question in the negative, the district court denied an application for a preliminary injunction that would have barred the agency from funding the project without first preparing an environmental impact statement. We agree with the district court's reading of the law, and we shall affirm the denial of the injunction.

I

The town of Tracy City, Tennessee, gets most of its water from a plugged and abandoned horizontal coal mine. This makeshift reservoir is clearly not adequate; the town has experienced severe water shortages during periods of drought, and water drawn from the mine at such times has been fouled with sediment. The sediment, according to the U.S. Department of Agriculture's Farmers Home Administration (FmHA), indicates either a disturbance of silt and dirt on the mine floor or a partial collapse of the mine. A further collapse could be catastrophic, the agency says.

The present water system violates Tennessee's Safe Drinking Water and Water Environmental Health Acts. The situation was bad enough to move Tennessee officials to obtain a consent decree, entered by a state chancery court in May of 1989, requiring the town to develop a long-term solution to its water supply problem and establishing penalties for failure to do so.

The town initially explored the possibility of building a dam in the gorge of a watercourse known as Sewanee Creek. The FmHA was prepared to provide financial assistance for a dam and water treatment plant at the Sewanee Creek location, but the town abandoned that site after the U.S. Environmental Protection Agency found that the project would have adverse impacts on the aquatic ecosystem and on the environment.

After considering numerous alternatives, the town eventually chose a site on Big Fiery Gizzard Creek. The new site is about one mile west of downtown Tracy City and half a mile above the Grundy Forest Natural Area,

a scenic-recreational preserve managed by the state. The reservoir created by a dam at the Fiery Gizzard site would cover approximately 57 acres of land in a shallow valley where scrub trees have replaced timber cut in the past.

The Tennessee Department of Environment and Conservation created a special task force to review the proposed Fiery Gizzard project and possible alternatives. In July of 1993 the task force concluded that a dam at the Fiery Gizzard site would offer the best prospects for a safe, reliable and affordable water supply. The task force recommended that the Commissioner of Environment and Conservation issue a permit for construction of the project there, and the Commissioner accepted the recommendation.

The Fiery Gizzard site has also been approved by the Tennessee Historical Commission and several federal agencies, including the Environmental Protection Agency, the Interior Department's Fish and Wildlife Service, the Army Corps of Engineers, and the Tennessee Valley Authority. The town has obtained all federal and state permits necessary for construction.

On February 18, 1994, the FmHA announced that it had determined, based on its assessment of the potential environmental impacts of funding the project, that the quality of the human environment would not be significantly affected by the project and that no environmental impact statement would be prepared. This "finding of no significant impact" was based on a 23–page environmental assessment which concluded that "[t]here will be no significant adverse impacts in connection with this project." The assessment went on to forecast a purely beneficial impact:

"The project will have a positive impact on the living environment of the residents of the area. They will be provided with a dependable, sanitary water supply."

Counsel for the Sierra Club and the Tennessee Citizens for Wilderness Planning—two of the plaintiffs herein—submitted a lengthy critique identifying a number of alleged shortcomings in the FmHA's environmental assessment. In July of 1994 the agency responded to these comments in an

addendum to the assessment. A "record of decision" prepared at the same time memorialized a determination that the Fiery Gizzard project would be funded without the preparation of an environmental impact statement.

The plaintiff environmental groups promptly brought suit against the FmHA and the town, alleging a violation of the National Environmental Policy Act of 1969, 42 U.S.C. §§ 4321 *et seq.* (NEPA). The plaintiffs moved for a preliminary injunction, and the motion was denied. This appeal followed.

## II

In enacting NEPA, Congress directed that all federal agencies, "to the fullest extent possible" (42 U.S.C. § 4332), include a detailed statement on environmental impact and other matters "in every recommendation or report on proposals for legislation *and other major Federal actions significantly affecting the quality of the human environment....*" 42 U.S.C. § 4332(2)(C). (Emphasis supplied.) Funding of the Fiery Gizzard project—a "Class II action" under the FmHA regulations, see 7 C.F.R. § 1940.312—is "presumed to be [a] major Federal action[ ]...." *Id.* Given this presumption, and given a finding in the environmental assessment that "[t]he proposed project should have a positive effect on the human environment," the plaintiffs contend that the preparation of an environmental impact statement is required under the plain language of the statute.

The statute, however, must be read in the light of the implementing regulations. The Council on Environmental Quality has published regulations telling federal agencies how to comply with NEPA, see 40 C.F.R. §§ 1500.1 *et seq.*, and the FmHA has promulgated supplemental regulations building on those of the Council. 7 C.F.R. §§ 1940.301 *et seq.* These regulations are entitled to substantial deference. *Andrus v. Sierra Club,* 442 U.S. 347, 357–58, 99 S.Ct. 2335, 2341, 60 L.Ed.2d 943 (1979).

The regulations make it clear that full-scale environmental impact statements— statements that are "very costly and time-consuming to prepare and [have] been the kiss of death to many a federal project," *Cronin v. U.S. Dept. of Agriculture,* 919 F.2d 439, 443 (7th Cir.1990)—need not be prepared for every major Federal action that might conceivably have a significant effect on the quality of the human environment. There are some variations of approach among the various federal agencies, but the FmHA's regulations prescribe the use of an "environmental assessment process" to identify, on a case-by-case basis, actions that actually will have a significant environmental effect and for which the preparation of an environmental impact statement is therefore necessary. 7 C.F.R. § 1940.313.

The environmental assessment has been described as a "rough-cut, low-budget environmental impact statement." *Cronin,* 919 F.2d at 443. It serves, among other things, to "[a]id an agency's compliance with [NEPA] when no environmental impact statement is necessary." 40 C.F.R. § 1508.9(a)(2). It also serves to provide "evidence and analysis for determining whether to prepare an environmental impact statement...." 40 C.F.R. § 1508.9(a)(1). In other words, the environmental assessment functions as "a screening device ... [that] allows agencies with limited resources to focus on truly important federal actions." *Preservation Coalition, Inc. v. Pierce,* 667 F.2d 851, 858 (9th Cir.1982). It is a highly significant "first step" that determines whether the next step will or will not be the preparation of a fully polished, high-budget environmental impact statement. See *Charter Township of Huron Mich. v. Richards,* 997 F.2d 1168, 1174 (6th Cir.1993).

In deciding, on the basis of the assessment, whether the proposed action is one affecting the quality of the environment "significantly," the agency must look at both the "context" of the action and its "intensity." 40 C.F.R. § 1508.27(a) and (b). "Intensity," § 1508.27(b) explains, means "the severity of impact." This choice of adjectives is significant, we think; one speaks of the severity of *adverse* impacts, not *beneficial* impacts.

If the agency reasonably concludes, on the basis of the environmental assessment, "that the project will have no significant adverse

environmental consequences," an environmental impact statement is not required. *Preservation Coalition*, 667 F.2d at 855.[1] In such event the agency must publish a finding of no significant impact. 40 C.F.R. § 1501.4(e). That, as we have seen, is what the FmHA did here.

█ In notifying the public that the FmHA would not prepare an environmental impact statement for the Fiery Gizzard project, the agency expressly declared that it "has assessed the potential environmental impacts of this proposed action and has determined that it will not significantly affect the quality of the human environment." The determination appears unassailable, in light of the administrative record, unless it is contradicted by the finding in the environmental assessment that "[t]he project will have a positive impact on the living environment of the residents of the area." We see no contradiction.

One of the central purposes of NEPA, after all, is to "promote efforts which will ... stimulate the health and welfare of man." 42 U.S.C. § 4321. Time and resources are not unlimited, as the Supreme Court has reminded us in *Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc.*, 435 U.S. 519, 551, 98 S.Ct. 1197, 1215, 55 L.Ed.2d 460 (1978), and *Metropolitan Edison Co. v. People Against Nuclear Energy*, 460 U.S. 766, 776, 103 S.Ct. 1556, 1562, 75 L.Ed.2d 534 (1983), and the health and welfare of the residents of Tracy City will not be "stimulated" by the delays and costs associated with the preparation of an environmental impact statement that would not even arguably be required were it not for the project's positive impact on health and welfare.

The regulations of the Council on Environmental Quality direct federal agencies "to make the NEPA process *more* useful to decisionmakers and the public," not less useful;

"to *reduce* paperwork and the accumulation of extraneous background data," not expand them; and "to emphasize *real* environmental issues and alternatives," not fanciful ones. 40 C.F.R. § 1500.2(b) (emphasis supplied). It was in keeping with this philosophy that the environmental assessment process was devised to screen projects where the preparation of an expensive and time-consuming environmental impact statement would serve no useful purpose. It would be anomalous to conclude that an environmental impact statement is necessitated by an assessment which identifies beneficial impacts while forecasting no significant adverse impacts, when the same assessment would not require the preparation of an impact statement if the assessment predicted no significant beneficial effect. The mere fact that the Fiery Gizzard project will have a positive impact on the health and welfare of the people it serves does not compel the conclusion that the project may not go forward without an environmental impact statement that would not otherwise be required.

█ This is not to say, of course, that the benefits of the project would justify a finding of no significant impact if the project would also produce significant adverse effects. Where such adverse effects can be predicted, and the agency is in the position of having to balance the adverse effects against the projected benefits, the matter must, under NEPA, be decided in light of an environmental impact statement. *Sierra Club v. Marsh*, 769 F.2d 868, 880 (1st Cir.1985). *Cf.* 40 C.F.R. § 1508.27(b)(1), which says that "[a] significant effect may exist even if the Federal agency believes that *on balance* the effect will be beneficial." (Emphasis supplied.)

The case before us is not one that required the agency to balance significant adverse impacts against significant benefits. It is true that the form used by the FmHA in prepar-

1. But *cf. Hiram Clarke Civic Club, Inc. v. Lynn*, 476 F.2d 421, 426-27 (5th Cir.1973), suggesting by way of *dictum* that an environmental impact statement may be necessitated by a significant beneficial environmental effect even if no adverse effects can be forecast. In the years since the *Hiram Clarke* opinion was issued, there has been "a growing awareness that routinely requiring such statements would use up resources better spent in careful study of actions likely to harm the environment substantially." *River Road Alliance, Inc. v. Corps of Engineers of U.S. Army*, 764 F.2d 445, 451 (7th Cir.1985). This growing awareness has been accompanied by "a loosening of the judicial reins on agency decisions not to require environmental impact statements." *Id.* at 450.

ing its environmental assessment for the Fiery Gizzard project contains boilerplate language that speaks of "balancing" potential benefits against "adverse environmental impacts identified by this assessment." See 7 C.F.R. Pt.1940, Subpt. G, Exh. H. In the same vein, the record of the decision to adhere to the conclusion that an environmental impact statement is unnecessary says that "the benefits of the proposal are greater than the reasonably foreseeable detriments." The problem, from the plaintiffs' standpoint, is that neither the original environmental assessment nor the addendum thereto identifies *any* significant adverse environmental impacts. There are simply no reasonably foreseeable detriments anywhere in the picture, as far as the administrative record discloses.

■ While the project does have the potential to change the flow patterns and temperature of the creek downstream of the project site, the FmHA has determined that because of the proposed dam's multi-port discharge feature "the stream will experience flow patterns that are similar to those common to slightly dryer years and have water temperatures common to streams in the area." The agency has likewise determined that the distance of the project from the Grundy Natural Area "preclude[s] the proposal from having any discernable impact on the important features of the natural area."

Neither of these determinations is arbitrary or capricious within the meaning of those terms as used in the Administrative Procedure Act, 5 U.S.C. § 706(2)(A). The broader finding that "[t]here will be no significant adverse impacts in connection with this project" likewise passes muster under the standards of the Administrative Procedure Act. And the FmHA having determined, through its extensive environmental assessment process, that the Fiery Gizzard project will not "significantly" affect the quality of the human environment, the agency was free to dispense with a full-scale environmental impact statement. The decision to do so was reached in accordance with law, and it is not up to us to substitute our judgment for that of the agency.[2]

### III

The plaintiffs contend that the FmHA prejudged this case, concluding even before the environmental assessment process was begun that the project would have no significant environmental impact; that the agency used the wrong standard in determining whether there were significant impacts; that the agency's analysis of alternatives was biased and inadequately documented; and that the agency failed adequately to address and document a number of reasonably foreseeable impacts. Largely for the reasons stated by the district court (Wiseman, J.) in its well-reasoned memorandum opinion, we conclude that these objections to the environmental assessment are without merit. The district court was correct in its view that the plaintiffs are not likely to prevail on the merits.

Other factors bearing on the issuance of the requested injunction are the probability of irreparable harm should the injunction be denied, the prospects for harm to others should the injunction be granted, and the question of where the public interest lies. See *Tyson Foods, Inc. v. McReynolds*, 865 F.2d 99, 101 (6th Cir.1989). None of these factors requires us to disturb the district court's ruling. The court did not abuse its

---

2. See *Neighbors Organized to Insure a Sound Environment, Inc. v. McArtor*, 878 F.2d 174, 178 (6th Cir.1989):

"We review an agency's decision not to prepare an [environmental impact statement] under the arbitrary and capricious standard. *Crounse Corp. v. ICC*, 781 F.2d 1176, 1193 (6th Cir.), *cert. denied*, 479 U.S. 890, 107 S.Ct. 290, 291, 93 L.Ed.2d 264 (1986). It is not the task of this court to substitute our judgment for that of the agency, whether the agency's decision relates to procedure or substance. *Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council*, 435 U.S. 519, 548–49, 98 S.Ct. 1197, 1213–15, 55 L.Ed.2d 460 (1978). Rather, this court need only determine whether the agency has adequately reviewed the issue and taken a 'hard look' at the environmental impact of its decision. *Kleppe v. Sierra Club*, 427 U.S. 390, 410 n. 21, 96 S.Ct. 2718, 2730 n. 21, 49 L.Ed.2d 576 (1976); *Crounse*, 781 F.2d at 1193. *See generally* Sunstein *Deregulation and the Hard–Look Doctrine*, 1983 SUP.CT.REV. 177."

discretion in denying the application for an injunction.

**AFFIRMED.**